NORTH AMERICAN AVIATION, INC., PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket Nos. 956–R, 980–R. Filed October 25, 1962.

*Charles Pickett, Esq., Melvin D. Goodman, Esq.,* and *James C. Foley, Esq.,* for the petitioner.

*James H. Prentice, Esq., William H. Arkin, Esq., William E. Nelson, Esq.,* and *Harland F. Leathers, Esq.,* for the respondent.

MULRONEY, *Judge:* Respondent issued its unilateral order determining that for the fiscal years 1953 and 1954, ended September 30, petitioner received excessive profits on its renegotiable business in the amounts of $6 million and $14 million, respectively. By an amend-

---

ment to its answer respondent now claims excessive profits for 1953 in the sum of $16 million and for 1954 in the sum of $21,500,000.

The evidence was heard by a commissioner of the Court, and his report, with such amendments as we deem appropriate, after consideration of the objections thereto submitted by the parties, is adopted as the basis of our findings of fact.

Much of the voluminous evidence is contained in a stipulation of facts.

### FINDINGS OF FACT.

The stipulation of facts is incorporated herein by this reference.

Petitioner is a Delaware corporation organized December 6, 1928. Its principal office is at Los Angeles, California. At the time of incorporation petitioner had a paid-in capital of $25 million, for which 2 million shares of no par value stock were issued. It later issued additional shares of stock for the shares or assets of other companies and changed the par value of its stock to $1 per share.

Petitioner began its operations as a manufacturer of airplanes in 1935. Prior to that time it held stock in several other companies engaged in the aviation and allied industries but did no manufacturing of its own. Beginning in 1935 it operated a small airplane manufacturing plant located at Dundalk, Maryland, and was also engaged in air transportation.

After winning a competitive Air Force award for a new trainer plane in 1935, petitioner built the first unit of its present Los Angeles plant on a leased tract of land which is now known as Los Angeles International Airport. It began manufacturing operations there early in 1936. It then had a book net worth of $5,878,000. It had 432 employees in March 1936.

During the 1936–1941 period, petitioner's operations steadily expanded. Its floor space was increased from 169,786 square feet on December 31, 1936, to 807,272 square feet on December 31, 1940. The number and types of airplanes completed and delivered by petitioner over the calendar years 1936 to 1940, inclusive, and for the first 9 months of 1941,[1] were as follows:

| | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 (9 Mos.) |
|---|---|---|---|---|---|---|
| Trainers | 82 | 212 | 323 | 655 | 963 | 1,614 |
| Fighters | | | | 7 | 236 | 8 |
| Bombers and reconnaissance | | | | 2 | | 89 |
| Observation and liaison | | | 77 | 129 | 32 | |
| Total | 82 | 212 | 400 | 793 | 1,231 | 1,711 |

[1] In 1941 petitioner changed its accounting period from a calendar year to a fiscal year beginning October 1 and ending September 30. References hereinafter to petitioner's accounting periods will relate to such fiscal years, unless otherwise indicated.

The advent of World War II greatly increased petitioner's orders for airplanes, particularly those of a military type. The following number and types of planes were manufactured by petitioner and delivered during the years 1942 to 1945, inclusive:

| | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|
| Trainers | 3,135 | 4,624 | 2,986 | 2,149 |
| Fighters | 764 | 799 | 5,645 | 7,651 |
| Bombers and reconnaissance | 1,110 | 3,210 | 4,463 | 2,412 |
| Total | 5,009 | 8,633 | 13,094 | 12,212 |

The aircraft which petitioner manufactured during the 1936–1945 period consisted principally of models of the AT–6 series of advanced trainers, the P–51 Mustang fighters, and the B–25 Mitchell series of medium bombers. The AT–6 trainers were used by the United States and most other Allied countries during World War II. The Mustang fighters were designed and produced originally for Great Britain, but were later produced in quantity for the United States. They attained considerable success in combat and were highly regarded by World War II pilots. The B–25 bombers were used principally in the South Pacific. They were used in the first air raid on Tokyo in 1942. In addition to airplanes of its own design, petitioner also manufactured B–24 bombers designed by Convair and C–82 bombers designed by Fairchild. Some of the airplanes manufactured by petitioner during the World War II period were built at its Los Angeles plant and some at Government-owned plants located at Grand Prairie, Texas, and Kansas City, Kansas.

At the end of World War II, almost all of petitioner's Government contracts for military airplanes were canceled. Petitioner then ceased operations at Government-owned plants and greatly curtailed its other operations. It built and delivered 143 military planes in 1946, 89 in 1947, 226 in 1948, and 335 in 1949. The number of its employees, which had reached a high of over 87,500 in 1944, dropped to 5,266 by the end of March 1946. Petitioner undertook the manufacture of a small commercial plane known as the Navion but this venture proved unsuccessful. It built a total of 1,002 of the Navion airplanes in 1947 and suffered a loss thereon of about $11 million.

Petitioner's net sales, cost and expenses, and net profits, before any taxes on income, for the years 1946 to 1949, inclusive, were as follows:

| | Net sales | Cost and expenses | Profits (or loss) |
|---|---|---|---|
| 1946 | $52,743,000 | $49,449,000 | $3,650,000 |
| 1947 | 19,855,000 | 32,237,000 | (11,728,000) |
| 1948 | 94,130,000 | 83,643,000 | 10,811,000 |
| 1949 | 124,180,000 | 112,678,000 | 12,056,000 |

As early as 1945 petitioner began to investigate the field of missiles. In 1946 it obtained a Government contract to produce a supersonic missile with a range of 175 to 500 miles. The requirements for this missile were later increased and eventually it became the Navaho cruise-type, intercontinental missile. Petitioner was doing work on the Navaho missile during the years 1953 and 1954. Also, during World War II, petitioner began designing and building jet-powered airplanes. All of the planes produced by petitioner during World War II were piston-driven. The jet-powered designs included the B-45, the first United States jet bomber, the FJ-1, the first United States Navy jet fighter, and the F-86, the first of petitioner's series of Air Force Sabre jet fighters. Petitioner had an order for a small number of FJ-1's at the close of World War II.

The missiles on which petitioner had begun experimental work for the Government about 1945 required a large rocket-powered engine. There were no rocket engines of that type being manufactured in this country at that time. In 1946 petitioner began the development of such an engine, using German V-2 rocket engine as a basic design. Also, in 1946 petitioner began work on a missile-guidance system. In 1947 petitioner made an initial investment in a rocket-engine testing range located in the Santa Susana Mountains, north of Los Angeles. The work on the rocket engines and guidance systems was continued and became an important phase of petitioner's operations in 1953 and 1954, and later years. Petitioner's total investment in the Santa Susana testing facilities at the end of 1954 amounted to about $3,500,-000. The Government's investment was about twice that amount. The testing range is still in use and has greatly expanded since 1954.

Petitioner's rocket engines have been used in guided missiles and in most of the Government's successful satellite launchings. Petitioner produced and delivered 6 rocket engines in 1953 and 13 in 1954. It was the sole producer of large rocket engines in the United States in those years. Also, in 1953 and 1954 petitioner delivered seven X-10 test missiles and built its first research atomic reactor.

Also, about 1946, petitioner began an investigation for the Air Force of the use of atomic power for the propulsion of airplanes and missiles. After about a year's work petitioner found that it was not feasible, and so advised the Air Force. However, on its own initiative, petitioner continued its study of atomic energy for peacetime uses and in 1948 received a contract from the Atomic Energy Commission to conduct research in that field. Work on that contract has continued up to the present time. Also, after World War II, petitioner continued its development work on military airplanes, particularly its F-86 Sabre jet fighters.

The hostilities in Korea began June 25, 1950. Shortly thereafter petitioner began to receive large Government orders for aircraft, mostly of military types. To fulfill these orders, it had to increase its floor space and facilities. At that time there was a large, partially idle Government-owned airplane plant at Columbus, Ohio, containing about 2,500,000 square feet of floor space. The plant had been built by the Government during World War II and had been used by Curtiss-Wright for the manufacture of Navy fighters. Curtiss-Wright had continued to occupy about one-half of the floor space. Another firm had used the other half for a period, manufacturing prefabricated houses, but it had ceased operations early in 1950. The Government decided in September 1950 to reactivate the Columbus plant and turn it all over to the petitioner. The space that had been occupied by Curtiss-Wright was turned over to petitioner in December 1950, and the balance in April 1951.

The Columbus plant was a well constructed plant but it required considerable remodeling and modernization of equipment. This work was done by the petitioner, largely at the Government's expense. It extended over several years, and put a heavy burden on petitioner's engineers and skilled workers.

In its operations at the Columbus plant, petitioner had to employ and train a large number of employees and establish new sources of supplies. There were from 1,500 to 1,800 Curtiss-Wright employees at the plant at the end of 1950 when petitioner took it over. These were retained by petitioner. A year later, there were over 10,000 employees. At the beginning of 1953, there were 15,204 employees and at about the middle of that year a peak of over 18,000. Petitioner had to transfer a number of its key employees from its Los Angeles plant from time to time to help organize the Columbus plant and train the new employees.

At first the Columbus plant was used only for assembling airplanes under a system of transferals from other plants. Later, and during 1953 and 1954, it was used for manufacturing several different models of airplanes and for modifying others.

Also, during 1953 and 1954, petitioner operated major plants at Downey and Fresno, California, and during one or both of those years maintained offices at New York; Dayton, Ohio; McClellan, California; and Washington, D.C. It also operated 27 supporting installations such as small manufacturing plants, test facilities, training schools, and warehouses, 17 of which were located at different points in Los Angeles County, California, and others at Fresno, Edwards Air Force Base, Palmdale, and Santa Susana, California; Cleveland, Columbus, and Washington Courthouse, Ohio; Detroit,

Michigan; Patrick Air Force Base, Florida; and White Sands, New Mexico.

The areas of floor space in use by petitioner, at the end of 1953 and 1954, in square feet, and their location, were as follows:

| Location | 1953 | 1954 |
|---|---|---|
| Los Angeles | 2,866,220 | 2,877,619 |
| Downey | 1,055,453 | 1,120,675 |
| Fresno | 312,887 | 340,419 |
| Columbus | 3,084,801 | 3,246,124 |
| Others | 1,329,185 | 1,613,033 |
| Total | 8,648,546 | 9,197,870 |

Some of this floor space was owned by petitioner, some was leased from the Government, and some leased from others, as follows:

| | Owned by petitioner | Leased from lessors other than Government | Owned by Government | Total |
|---|---|---|---|---|
| 1953 | 2,838,291 | 1,815,566 | 3,994,689 | 8,648,546 |
| 1954 | 2,879,426 | 1,891,462 | 4,426,982 | 9,197,870 |

Most of the floor space at Los Angeles was owned by petitioner while that at Downey and Columbus was owned by the Government. Most of the other floor space, at Fresno and other locations, was leased from private owners. Except for negligible amounts petitioner did not pay rent for the floor space leased from the Government.

The plant which petitioner occupied at Downey, California, had been built by another airplane manufacturer and during World War II had been expanded by the Government. It was owned in part by the Government and in part by petitioner until September 1953 when, in a transaction between petitioner and the Government involving other properties, it became wholly Government owned. The plant was used by petitioner both in the manufacture of airplanes and for work on the Navaho missile and related programs.

The following table shows the different types and number of airplanes of each type manufactured by petitioner and delivered during 1950–1952 period:

| | 1950 | 1951 | 1952 |
|---|---|---|---|
| Trainers | 103 | 321 | 360 |
| Fighters | 309 | 169 | 402 |
| Bombers and reconnaissance | 94 | 29 | 19 |
| Total | 506 | 519 | 781 |

The original cost to the petitioner and to the Government of the property owned by each, and in use by petitioner on September 30,

1952, 1953, and 1954, according to the best information of the parties, was as follows:

NORTH AMERICAN PROPERTY IN USE AS OF SEPT. 30, 1952, 1953, AND 1954

| | | Sept. 30— | |
| Land and land improvements: | 1952 | 1953 | 1954 |
|---|---|---|---|
| Los Angeles | $1,104,652 | $1,049,055 | $2,527,497 |
| **Buildings (including building equipment):** | | | |
| Los Angeles | 9,848,627 | 9,529,131 | 10,056,788 |
| **Leasehold improvements:** | | | |
| Los Angeles | 2,103,151 | 2,534,778 | 1,991,515 |
| Fresno | --------- | 279,224 | 364,190 |
| Total | 2,103,151 | 2,814,002 | 2,355,705 |
| Total land and land improvements, buildings, and leasehold improvements | 13,056,430 | 13,392,188 | 14,939,990 |
| **Furniture and fixtures, tools, and machinery and equipment:** | | | |
| Los Angeles | 10,906,734 | 13,050,769 | 14,241,053 |
| Columbus | 1,561,141 | 1,444,435 | 985,835 |
| Fresno | --------- | 539,978 | 719,766 |
| Total | 12,467,875 | 15,035,182 | 15,946,654 |
| One-sixth interest in cooperative wind tunnel at California Institute of Technology | 521,569 | 538,344 | 542,412 |
| Total property in use | 26,045,874 | 28,965,714 | 31,429,056 |

Notes:

1 Data above exclude construction in progress.

2 Included under Los Angeles are both the Los Angeles and Downey plants and their supporting installations. At September 30, 1952, Los Angeles also includes the Fresno plant and its supporting installation.

GOVERNMENT-OWNED PROPERTY IN USE AS OF SEPT. 30, 1952, 1953, AND 1954

| | | Sept. 30— | |
| Land and land improvements: | 1952 | 1953 | 1954 |
|---|---|---|---|
| Los Angeles | --------- | $52,218 | $93,495 |
| Columbus | --------- | 65,165 | 133,560 |
| Total | --------- | 117,383 | 227,055 |
| **Buildings (including building equipment):** | | | |
| Los Angeles (Note 1) | $4,655,676 | 7,028,079 | 8,854,394 |
| Columbus | 9,176,374 | 19,685,255 | 29,901,731 |
| Total | 13,832,050 | 26,713,334 | 38,756,125 |
| Total land and land improvements, and buildings | 13,832,050 | 26,830,717 | 38,983,180 |

GOVERNMENT-OWNED PROPERTY IN USE AS OF SEPT. 30, 1952, 1953, AND 1954—
Continued

| Furniture and fixtures, tools, and machinery and equipment: | 1952 | *Sept. 30—*<br>1953 | 1954 |
|---|---|---|---|
| Los Angeles | $6,774,324 | $13,773,765 | $20,291,349 |
| Columbus | 12,724,449 | 20,282,837 | 25,931,763 |
| Fresno | _____ | 14,432 | 16,077 |
| Total | 19,498,773 | 34,071,034 | 46,239,189 |
| Total property in use | 33,330,823 | 60,901,751 | 85,222,369 |

Notes:

1 Each year includes $4,350,000 of Downey plant facilities for which no segregation between land, buildings, furniture and fixtures, tools, and machinery and equipment is available.

2 Included under Los Angeles are both the Los Angeles and Downey plants and their supporting installations. At September 30, 1952, machinery and equipment in use at the Fresno plant is included under Los Angeles.

3 Amounts at September 30, 1954, do not include facilities in use, for which cost information is not available, at the following locations:

McClellan Air Force Base, California—approximately 800 square feet of office space.
Huntsville, Alabama—approximately 240 square feet of office space.
White Sands, New Mexico—approximately 6,000 square feet of rocket engine test area and office space.
Patrick Air Force Base, Florida—approximately 17,600 square feet of hangar space.
Palmdale, California—airport facilities under joint-use with three other aircraft manufacturers.

The types and the number of different models of airplanes built by petitioner and delivered to the Government, in each of the years 1953 and 1954, were as follows:

| | 1953 | 1954 | *Total*<br>1953–1954 |
|---|---|---|---|
| Fighters: | | | |
| F–86D | 726 | 954 | 1,680 |
| F–86F | 1,235 | 578 | 1,813 |
| F–86H | 2 | 36 | 38 |
| F–100A | 2 | 48 | 50 |
| FJ–2 | 9 | 192 | 201 |
| FJ–3 | 0 | 44 | 44 |
| Total fighters | 1,974 | 1,852 | 3,826 |
| Trainers: | | | |
| T–28A | 362 | 49 | 411 |
| T–28B | 0 | 206 | 206 |
| Total trainers | 362 | 255 | 617 |
| Bombers and reconnaissance: | | | |
| AJ–2P | 8 | 15 | 23 |
| AJ–2 | 30 | 25 | 55 |
| Total bombers and reconnaissance | 38 | 40 | 78 |
| Total aircraft | 2,374 | 2,147 | 4,521 |

The Model F–86D was a later, improved model of F–86A, which was the first production model of petitioner's F–86 Sabre

jet series. The F-86 was first flown in 1947. It was designed as a straight-wing airplane but was later changed, in the F-86A production model, to a swept-wing design, patterned after the German Messerschmidt 262. Some of the other features of the F-86A and other models of the series were wing slats, hydraulic boosters for pilot controls, and electrically powered adjusters for the horizontal stabilizers. The F-86A was designed for a subsonic speed of over 600 miles per hour but in power dives attained a speed in excess of sound (approximately 750 miles per hour). It was the first tactical aircraft ever to attain such speed. It broke the world's speed record in a straight-away course in September 1948, with a speed of over 670 miles per hour, and held that record for 4 years, until it was broken by a later model of the series, the F-86D.

The F-86F was a single place jet-powered fighter-bomber. The designing of this model was begun about May 1950, and was substantially completed in August 1951. It was used in the Korean fighting where it established a decided superiority over the Russian built MIG 15. Its "kill ratio" over the MIG 15 was 16 to 1. The F-86F's and F-86D's accounted for the major portion of petitioner's renegotiable business in 1953 and 1954.

The F-86H was an improved model of the F-86F fighter-bomber. It was not produced in quantity in 1953 or 1954. It was intended more as an insurance against possible delay in the production of the supersonic F-100A.

Petitioner began the designing work on the F-100A in January 1951. It was designed for a newly developed, more powerful jet engine, the J-57, made by Pratt & Whitney. The Government had expended $100 million in the development of this engine. The basic design of the F-100A was essentially completed by the end of January 1953. It incorporated some of the features of the F-86 series and also many advanced features. The first F-100A was delivered to the Government in June 1953. A few months later it set a new world's speed record which stood until August 1955. It was superior in performance to any airplane previously built. The development of the F-100A was a major step in aviation.

The FJ-2 was an adaptation of the F-86 series built for the Navy. The basic design was completed about February 1952. An improved model, the FJ-3, followed. The later model embodied a British designed engine with 25-percent more thrust than the FJ-2 engine.

The T-28A and the T-28B models were both trainers produced for the Air Force and the Navy, respectively. They were two-place planes powered by piston-driven motors. They were used for a number of years by the United States and other countries.

The AJ-2P was a Navy photo-reconnaissance plane, and the AJ-2 a Navy long-range attack plane. They were both large, heavy planes with two piston-driven engines, and a jet engine for added power when needed. The AJ-2 was the only carrier-based plane capable of delivering an atomic bomb at long range. By use of a removable tanker package devised by petitioner it was quickly convertible into a tanker.

In addition to the 10 models described above, petitioner during 1953 and 1954 was doing work on 4 other airplane models which were not delivered until later years. Petitioner was also working on guided missiles, rocket engines, electronics, and electro-mechanical equipment and atomic energy facilities.

The F-86A, F-86F, and F-86E airplanes were all used in the Korean fighting and contributed in a large measure to the air supremacy of the United Nations' Air Forces.

In 1954, petitioner's past president and then chairman of the board of directors, James H. Kindelberger, was given the Exceptional Service Award of the United States Air Force, and the Collier Trophy for 1953. The citation for the Air Force Award stated that:

JAMES HOWARD KINDELBERGER distinguished himself by rendering exceptional service to the United States Air Force and his country for forty years as an engineer, designer, and producer of military aircraft. His name is synonymous with air power. As one of the small band of American pioneers who has fought for the development of air power through the years, his accomplishments stand out in military aviation progress from the Jenny to the Jet. He has no peer as a designer and producer of air frames for fighter aircraft. By applying scientific manufacturing techniques, he revolutionized the aviation industry. His ability to translate the most exacting requirements of the USAF into mass-produced, yet precision operated aircraft was particularly reflected in the combat performances of the F-51, Mustang fighter, and the B-25 Mitchell attack bomber, among the best airplanes produced in their respective classes during the last war. More recently, the North American F-86 Sabrejet has distinguished itself in Korea as the principal United Nations' plane to accept and throw back the challenge offered by the MIG-15 to our air superiority over the battlefield. Our country is indebted to Mr. Kindelberger for his outstanding contribution to the development of the United States Air Force from its modest beginning to its present role of this nation's first line of defense.

The Collier Trophy, which was presented by the then President of the United States, was awarded "for development of the first Supersonic Fighter Airplane in service in the United States Air Force, the North American Land Based F-100 Super Sabre." This award is presented annually by the National Aeronautic Association "for the greatest achievement in aviation in America, the value of which has been thoroughly demonstrated by actual use during the preceding year."

Petitioner's adjusted renegotiable sales, costs and expenses (exclusive of income taxes), and profits (before income taxes) in its Los Angeles and Columbus divisions, were as follows:

| | Los Angeles | | Columbus | |
|---|---|---|---|---|
| | 1953 | 1954 | 1953 | 1954 |
| Sales | $432,857,566 | $397,842,517 | $185,199,111 | $251,093,450 |
| Costs and expenses | 400,121,567 | 363,879,094 | 173,446,194 | 230,616,628 |
| Profits | 32,735,999 | 33,963,423 | 11,752,917 | 20,476,822 |

Petitioner's 1953 and 1954 sales and profits, before any taxes on income, by type of contract, on both renegotiable and non-renegotiable business, were as follows:

| Renegotiable business | Fiscal year 1953 | | | Fiscal year 1954 | | |
|---|---|---|---|---|---|---|
| | Sales | Costs and expenses | Profit (loss) | Sales | Costs and expenses | Profit (loss) |
| Contract category: | | | | | | |
| Cost-plus-a-fixed fee | $67,749,903 | $64,560,212 | $3,189,691 | $38,474,116 | $85,182,367 | $3,291,749 |
| Incentive-type | 503,416,337 | 462,707,668 | 40,708,669 | 541,329,004 | 490,384,638 | 50,944,366 |
| Price redetermination | 4,262,819 | 4,070,571 | 192,248 | 6,359,466 | 6,020,458 | 339,008 |
| Fixed price | 8,556,398 | 8,354,543 | 201,855 | 6,664,228 | 6,119,874 | 544,354 |
| No-fee facilities | 17,874,789 | 18,023,390 | (148,601) | 14,186,111 | 14,282,573 | (96,462) |
| Terminated | 19,525,960 | 19,092,679 | 433,281 | 1,248,328 | 1,201,974 | 46,354 |
| Total renegotiable business | 621,386,206 | 576,809,063 | 44,577,143 | 658,261,253 | 603,191,884 | 55,069,369 |
| Non-renegotiable business | 7,308,583 | 5,624,764 | 1,683,819 | 2,870,050 | 274,599 | 2,595,451 |
| Total business | 628,694,789 | 582,433,827 | 46,260,962 | 661,131,303 | 603,466,483 | 57,664,820 |

Petitioner's "Cost-Plus-A-Fixed-Fee" contracts in 1953 and 1954 were, for the most part, contracts for research and development in the fields of rocket engines, guided missiles, guiding systems, nuclear research, and modifying and rebuilding airplanes.

More than 80 percent of petitioner's renegotiable business in 1953 and 1954 was derived from so-called "incentive contracts." In general, under this type of contract, the Government and the contractor negotiated a price for a specified airplane, based on estimated average cost per plane, plus a profit, in the Air Force contracts, usually of about 8 percent of estimated costs. This was known as the "initial target price." After a certain number of planes had been built and delivered at the initial target price there was a negotiation of a second target price, known as a "firm target price." This was derived from the actual costs incurred and the estimated costs to complete, plus profits. The actual costs were determined, or estimated as to any unknown costs, after delivery of the last airplane under the contract. If actual costs were less than firm target price the contractor received

25 percent of such "under-run," and the Government 75 percent. If actual costs were greater than firm target price the conrtactor bore 25 percent of the "over-run" burden and the Government 75 percent. The contractor's profits, however, could not exceed 15 percent of estimated costs and the burden of all overruns above 125 percent of firm target costs was borne by the contractor.

One of the principal incentive contracts under which petitioner built F86–D's in 1953 and 1954 was AF 33 (600) 6202 dated May 21, 1952 (the initial tentative target) for 707 units at $112,678 per unit. There was a revised tentative target contracted January 27, 1953, for 901 units at $114,471 per unit. A firm target price of $143,156 per unit was negotiated February 9–12, 1954 (contract date April 29, 1954). The final cost was negotiated January 30, 1956 (contract dated March 12, 1956), at $120,228 or $22,928 per unit under firm target. For 1953 the sales under this contract were $13,457, the costs $12,149, and the profits, before income taxes, $1,308. For 1954 the sales were $123,327,866, the costs $108,792,599, and the profits $14,535,267. Over the entire life of the contract, 1953–1956, the sales were $150,871,098, costs $133,092,191, and profits $17,788,907.

The firm target price was arrived at by negotiations in which both the contractor and the Government were represented. Some of these negotiations lasted several days. The intervals between initial target and firm target were from less than a year to more than 3 years. The firm target price, usually, but not always, exceeded the initial target price. The final cost, that is, the average per unit cost over the entire contract, usually, was less than the firm target average per unit price. The fact that the contractor was to have the right to use Government facilities free of cost in the performance of some of its contracts was taken into account by the negotiators when the contracts were negotiated. Some or all of these contracts provided for an adjustment in the contract price if the Government should withdraw this right.

The "Price Redetermination" contracts were principally for modifying and rebuilding airplanes, for spare parts, and for designing and engineering studies. The "Fixed Price" contracts were primarily for the manufacture of spare parts for airplanes. The "No Fee Facilities" contracts were for the construction or acquisition by petitioner, at Government cost, of facilities to be owned by the Government and used by petitioner in performance of Government contracts. 'Terminated" contracts were the contracts that were wholly or par-

tially terminated during 1953 and 1954. Under these contracts, petitioner was permitted to recover all reimbursable costs, but not all actual costs, and, in some instances, profits as well.

The following schedule shows petitioner's 1953–1954 renegotiable sales, costs, and expenses, and profits, before State and Federal income taxes, on each of the airplane models delivered during those years, as well as on the remanufacture, modification, and repair of aircraft, and on spare parts, under incentive contracts:

| Contract and aircraft model or description | Fiscal 1953 | | | Fiscal 1954 | | |
|---|---|---|---|---|---|---|
| | Sales | Costs and expenses | Profit (loss) | Sales | Costs and expenses | Profit (loss) |
| T-28A | $25,307,584 | $23,764,918 | $1,542,666 | $9,969,078 | $9,233,315 | $735,763 |
| T-28B | | | | 19,396,275 | 17,603,249 | 1,793,026 |
| F-86A | 18,569 | 15,775 | 2,794 | 4,186 | | 4,186 |
| F-86D | 182,432,359 | 164,916,836 | 17,515,523 | 165,366,356 | 146,786,340 | 18,580,016 |
| F-86E | 362,546 | 345,585 | 16,961 | 27,742 | 24,927 | 2,815 |
| F-86F | 202,663,065 | 185,900,669 | 16,762,396 | 89,713,688 | 81,216,389 | 8,497,299 |
| F-86E and F-86F | 7,640,780 | 7,166,722 | 474,058 | 670,100 | 624,108 | 45,992 |
| F-86H | 3,552,815 | 3,320,383 | 232,432 | 27,870,438 | 25,682,451 | 2,187,987 |
| F-100A | 3,940,443 | 3,679,690 | 260,753 | 42,569,311 | 39,455,397 | 3,113,914 |
| AJ-1 | 1,740,241 | 1,566,068 | 174,173 | 315,651 | 280,655 | 34,996 |
| AJ-2P | 14,059,436 | 12,646,982 | 1,412,454 | 22,194,772 | 20,093,417 | 2,101,355 |
| AJ-2 | 25,064,987 | 22,895,720 | 2,169,267 | 25,201,663 | 22,847,907 | 2,353,756 |
| XFJ-2 and XFJ-2B | 1,211,034 | 1,146,731 | 64,303 | 31,687 | 10,786 | 20,901 |
| FJ-2 | 10,722,469 | 9,824,222 | 898,247 | 98,451,869 | 89,952,858 | 8,499,011 |
| FJ-3 | | | | 16,763,359 | 14,963,660 | 1,799,699 |
| Total incentive contracts for aircraft | 478,716,328 | 437,190,301 | 41,526,027 | 518,546,175 | 468,775,459 | 49,770,716 |
| Remanufacture, modification or repair of aircraft, etc | 2,737,620 | 2,766,234 | (28,614) | 4,011,553 | 3,721,440 | 290,113 |
| Spare parts | 21,962,389 | 22,751,133 | (788,744) | 18,771,276 | 17,887,739 | 883,537 |
| Total incentive contracts | 503,416,337 | 462,707,668 | 40,708,669 | 541,329,004 | 490,384,638 | 50,944,366 |

Petitioner's different types of non-aircraft renegotiable business, in 1953 and 1954, resulted in sales as follows:

| | 1953 | 1954 |
|---|---|---|
| Guided missiles | $27,071,456 | $36,778,103 |
| Rocket engines | 10,267,102 | 14,453,092 |
| Electronics and electromechanical equipment | 18,204,335 | 22,314,479 |
| Atomic energy | 6,591,950 | 6,158,596 |
| Total | 62,134,843 | 79,704,270 |

Petitioner's book net worth, its net sales, and its percentage return of profits,[2] both on sales and book net worth, at the beginning of each of the years, for the entire 1939–1954 period (the calendar years 1939–

[2] Before any taxes on income and before any adjustment on account of special accounting agreement between petitioner and the Government, but after renegotiation, when applicable, prior to 1953.

1940, the 9 months' period ended September 30, 1941, and the fiscal years ended September 30, 1942–1954) were as follows:

| Year | Beginning book net worth | Return on beginning book net worth | Net sales | Return on net sales |
|---|---|---|---|---|
| | *In thousands* | *Percent* | *In thousands* | *Percent* |
| 1939 | $7,557 | 114.12 | $27,609 | 31.24 |
| 1940 | 9,836 | 104.92 | 36,862 | 28.00 |
| 9 months ended Sept. 30, 1941 | 12,632 | 140.10 | 60,866 | 29.08 |
| Fiscal year ended Sept. 30: | | | | |
| 1942 | 16,787 | 193.52 | 235,026 | 13.82 |
| 1943 | 21,395 | 175.89 | 463,484 | 8.12 |
| 1944 | 29,750 | 166.99 | 680,049 | 7.31 |
| 1945 | 40,503 | 67.29 | 376,274 | 7.24 |
| 1946 | 43,961 | 8.30 | 52,743 | 6.92 |
| 1947 | 39,417 | (29.75) | 19,855 | (59.07) |
| 1948 | 39,389 | 27.45 | 94,130 | 11.49 |
| 1949 | 44,122 | 27.32 | 124,180 | 9.71 |
| 1950 | 47,993 | 29.56 | 143,033 | 9.92 |
| 1951 | 51,786 | 30.60 | 177,675 | 8.92 |
| 1952 | 53,914 | 38.97 | 315,271 | 6.66 |
| 1953 | 57,441 | 71.72 | 634,688 | 6.49 |
| 1954 | 65,061 | 83.33 | 645,821 | 8.39 |

Petitioner's book net worth, in 1953 and 1954, does not reflect the true value of the assets used in the business. It does not include any asset value for goodwill. This goodwill, or know-how, was an asset of great value to petitioner. Petitioner maintained a large staff of trained executives and engineers, highly regarded in the industry, and a great number of skilled mechanics. It had been recognized as one of the country's top airplane designers and manufacturers for a number of years. Since the beginning of World War II petitioner had been relied upon heavily by the Government for several types of military aircraft, especially the fighter types. All but 2 of the 10 different airplane models which petitioner delivered to the Government in the calendar years 1953 and 1954 were combat planes. They comprised about 25 percent of all military airplanes and 50 percent of all fighter planes procured by the Government during those years.

Also, in the performance of its Government contracts, in 1953 and 1954, petitioner utilized its own facilities and equipment of considerable value which had been fully depreciated in prior years and were not reflected in book net worth. Many other of petitioner's physical assets which were reflected in book net worth had a current value greatly in excess of book value.

The average return of income on book net worth is generally higher in the aircraft industry than in other major industries and the return on sales lower. Of 20 leading airplane manufacturers in the United States the ratio of petitioner's profits to book net worth was usually higher than the average over the entire 1942–1954 period. Petitioner ranked ninth and sixth in the industry in the years 1953 and 1954, respectively, in net income as a percentage of net book worth. The average of 20 companies was 60.1 percent in 1953 and 1954, while petitioner's was 69.8 percent in 1953, and 80.7 percent in 1954.

It has been a long-standing custom of the Government to make progress payments to contractors in the airplane industry and in other industries, where construction extends over a long period. Such payments were made to petitioner in 1953 and 1954 at the effective rate of about 70 percent of incurred costs. Legal title to materials and work in progress with respect to such payments vested in the Government. Petitioner also borrowed large sums of money from banks for additional working capital needed in the performance of its contracts. The bank loans amounted to approximately $56,500,000 during most of the 1953–1954 period. Petitioner paid interest on such loans of $1,853,747 in 1953, and $1,790,701 in 1954. These interest payments were not treated as allowable charges against renegotiable contracts, under procurement regulations, but they have been so treated for the purpose of renegotiation.

The aircraft industry is highly variable; both the volume of business and profits may fluctuate widely in response to external forces over which it has no control. This is especially true of the segment of the industry which specializes in military aircraft, as does petitioner. In times of war or national peril it may be pushed to capacity production, and suddenly find its business reduced to skeleton dimensions. Such was petitioner's experience after the close of World War II. The Government usually reserves the right to terminate its contracts at will. There were 23 cancellations by the Government of petitioner's prime contracts in 1953 and 33 in 1954.

For all practical purposes the Government was petitioner's sole customer in 1953 and 1954, and, in fact, during most of the years of petitioner's successful operations. The possibility of the sudden loss of substantially all of its Government business constituted a continuing threat to petitioner's business. Without the Government's contracts petitioner's survival would have been in serious doubt. At best it would have been unable to hold its large organization together, particularly its trained engineers and skilled laborers upon which its operations largely depended.

The following table shows the number of military aircraft procured by the Government in the calendar years 1940 to 1954, inclusive, and the number and percentage of such aircraft manufactured by the petitioner:

| Year | Procured by Government | Manufactured by petitioner | Percent | Year | Procured by Government | Manufactured by petitioner | Percent |
|---|---|---|---|---|---|---|---|
| 1940 | 6,028 | 679 | 11.3 | 1948 | 2,536 | 292 | 11.5 |
| 1941 | 19,445 | 2,544 | 13.1 | 1949 | 2,592 | 344 | 13.3 |
| 1942 | 47,675 | 6,035 | 12.7 | 1950 | 2,773 | 545 | 19.7 |
| 1943 | 85,433 | 9,109 | 10.7 | 1951 | 5,446 | 533 | 9.8 |
| 1944 | 95,272 | 14,862 | 15.6 | 1952 | 9,302 | 1,000 | 10.8 |
| 1945 | 46,865 | 8,224 | 17.5 | 1953 | 10,626 | 2,510 | 23.6 |
| 1946 | 1,417 | 19 | 1.3 | 1954 | 8,740 | 2,134 | 24.4 |
| 1947 | 2,122 | 100 | 4.7 | | | | |

Petitioner, as well as other airplane manufacturers, usually experienced a great many difficulties in producing airplanes that would meet the high standards of perfection set for them by the Government and the severe tests to which they were subjected. None of the airplanes manufactured by the petitioner, or other companies, during 1953 and 1954, was free of troubles. Each model had its own engineering problems. These problems multiplied with each step in the advancement of the art. Every substantial increase in speed, especially, and in range, or engine power, or fire power, gave rise to new problems. This was especially true in the approach to the speed of sound. When first subjected to these high speeds aircraft of proven design developed aerodynamic deficiencies totally unknown to the engineers and pilots. Many of these deficiencies could be detected only by testing and corrected only by trial and error. Some were latent deficiencies that did not appear until the aircraft had been subjected to actual combat conditions. Aircraft with known deficiencies were sometimes considered combat capable and were used successfully. When defects or deficiencies of sufficient importance were discovered the aircraft were grounded until corrections could be made.

As to efficiency of operations, quality of products, ability to meet production schedules, and pricing on Government contracts, petitioner has at all times here material stood at or near the top of the aircraft industry. In general, as a builder of military aircraft, petitioner during 1953 and 1954 was not excelled by any other member of the industry and equaled by only a few, if any.

To meet the urgent production demands of the Air Force some models of the F–86 airplane were built at both the Los Angeles and the Columbus plants. Due to lack of production experience and the use of untrained personnel at the Columbus plant, the unit cost of production there was larger than at the Los Angeles plant. The unit costs at both plants were reduced as production increased. The unit cost production of the F–86F decreased at the Los Angeles plant from $120,916 at October 1952, to $92,793 for the period March to June 1954, and at the Columbus plant from $169,572 for the April 1952 to September 1953 period, to $128,821 for the August 1953 to May 1954 period. On a comparative basis, petitioner's production costs of military aircraft in 1953 and 1954 were considerably lower than the average of the aircraft industry, and on the whole were the lowest in the industry.

Petitioner was especially economical in the use of materials and manpower. It developed, or adopted, and utilized in its operations numerous material and labor-saving devices or ideas, such as the "die quench" method used in shaping "machined grid" formed wings, the integrally stiffened construction of airplane wings, the installation

of a system of automatic vacuum collection of salvage scrap, particularly of the high-value aluminium scrap, the purchase of critical materials in template form, the use of the photo-electric cell method of riveting, the organization among its key employees of a revolving conservation committee, and a plant-wide safety program.

The accident rate among petitioner's employees, per million of man-hours, was 2.21 percent in 1953 and 1.52 percent in 1954, as against 3.8 percent in 1953 and 3.2 percent in 1954 for the aircraft manufacturing industry as a whole, and 13.4 percent in 1953 and 11.9 percent in 1954 for all manufacturing industries.

Petitioner utilized all of its plant facilities at near full capacity in 1953 and 1954. It operated two full shifts and a skeleton third shift during both of those years.

The following schedule shows petitioner's dividends and the earnings retained in the business for the 9 months ended September 30, 1941, and for each of the fiscal years 1942 to 1954, inclusive:

| Year | Dividends | Net income retained | Year | Dividends | Net income retained |
|---|---|---|---|---|---|
| 9 months ended Sept. 30, 1941 | $2,576,275 | $4,249,679 | Fiscal year ended Sept. 30—Continued | | |
| Fiscal year ended Sept. 30: | | | 1950 | $4,293,791 | $3,792,464 |
| 1942 | 4,293,791 | 4,607,050 | 1951 | 4,293,791 | 2,127,821 |
| 1943 | 3,435,033 | 8,355,290 | 1952 | 4,293,791 | 3,527,095 |
| 1944 | 3,435,033 | 10,753,486 | 1953 | 5,152,549 | 7,620,812 |
| 1945 | 4,293,791 | 3,457,777 | 1954 | 9,446,341 | 12,733,395 |
| 1946 | 6,870,066 | [1] (4,544,424) | 1955 | 15,457,649 | 16,891,527 |
| 1947 | | [2] (28,259) | 1956 | 13,224,877 | 15,536,085 |
| 1948 | 1,717,517 | 4,733,685 | 1957 | 16,030,154 | 17,834,308 |
| 1949 | 3,435,033 | 3,871,376 | 1958 | 12,824,223 | 13,962,071 |

[1] Amount by which dividends exceeded net income for the fiscal year.
[2] Loss for the fiscal year.

The compensation paid or accrued to petitioner's executive officers during 1953 and 1954, including salaries and incentive pay, was as follows:

| | 1953 | 1954 |
|---|---|---|
| J. H. Kindelberger | $187,500 | $253,637 |
| J. L. Atwood | 141,000 | 183,007 |
| R. A. Lambeth | 69,000 | 81,843 |
| R. H. Rice | 76,000 | 91,940 |
| J. S. Smithson | 69,193 | 81,843 |
| A. T. Burton | 37,708 | 45,431 |
| C. J. Gallant | 51,416 | 68,618 |
| L. L. Waite | 48,639 | 65,212 |
| S. G. Anspach | 31,292 | 39,198 |
| Totals | 711,748 | 910,729 |

The airplanes manufactured by petitioner in 1953 and 1954 contain thousands of different parts. Some of the major parts such as motors, wheels, and various instruments, were provided by the Gov-

ernment without cost to the petitioner. Other parts were obtained by petitioner from subcontractors. It was the policy of the Government to encourage subcontracting in the airplane industry. Petitioner's subcontracting costs amounted to 25 percent of its total costs in 1953 and 1954.

Petitioner was responsible for designing the aircraft and assembling the various components into a complete workable unit. This was a task of great complexity, requiring many engineering and mechanical skills. Many difficult problems arose which could be solved only by extensive research and experimentation. In resolving these problems the Government contributed a vast amount of assistance to the petitioner and other airplane manufacturers. The Air Force maintained an Air Research and Development Center at Wright Field, Dayton, Ohio, and a Flight Test Center at Edwards Air Force Base, California. The Navy maintained the Naval Air Test Center at Patuxent, Maryland; and there were other various Government facilities at other locations. These facilities and the results of the Government's various tests and experiments were available to petitioner and other aircraft manufacturers in the performance of Government contracts. Government engineers and technical advisers were regularly stationed at petitioner's plants in 1953 and 1954.

OPINION.

This is a proceeding under the Renegotiation Act of 1951 (50 U.S.C. App. sec. 1218) hereinafter sometimes referred to as the Act, for a redetermination of the amount of excessive profits, if any, received or accrued by petitioner for the years 1953 and 1954 on its renegotiable business. The Renegotiation Board determined that petitioner realized excessive profits of $6 million in 1953 and $14 million in 1954. The statute giving this Court jurisdiction in renegotiation cases (sec. 108 of the Act) provides this Court "may determine as the amount of excessive profits an amount either less than, equal to, or greater than that determined by the Board." The Renegotiation Board now asks us to determine greater amounts of excessive profits than it determined, to-wit: $16 million in 1953 and $21,500,000 in 1954. Petitioner seeks a determination that it realized no excessive profits in either year. The above-cited provision of the Act also provides a proceeding such as this "shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo."

The Act defines "excessive profits" in section 103(e) as "the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be ex-

cessive." The Act does not provide any measurable objective standards upon which the determination of excessive profits is to be based. It goes on to provide that—

In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

We have no problem here with respect to the amount of profits petitioner derived from its renegotiable contracts during each of the years in question. Section 103 of the Act provides: "The term 'profits derived from contracts * * *' means the excess of the amount received or accrued under such contracts * * * over the costs paid or incurred with respect thereto and determined to be allocable thereto." We have stipulated figures of actual costs and payments showing petitioner's profits from renegotiable contracts, which comprise over 90 percent of its entire profits, amounted to approximately $44,577,000 in 1953 and $55,069,369 in 1954. These contracts, for the most part, were for the production of military airplanes for the United States Air Force and the Navy. The airplanes included trainers, fighters, and bombers, but were predominately fighters. They were produced in large numbers, 1,974 in 1953 and 1,852 in 1954. Non-aircraft renegotiable business accounted for a small part of petitioner's renegotiable business in the years in question. These were contracts relating to guided missiles, rocket engines, electronics, and atomic energy.

There were in all some 31 contracts from which petitioner realized renegotiable profits during the years in question. Our determination as to excessive profits is not to be made with respect to amounts received or accrued under separate contracts in each year. The Act provides that the determination as to excessive profits must be made with

respect to the aggregate amounts received or accrued each year under all renegotiable contracts unless there is mutual consent for separate contract renegotiation proceedings. Sec. 105(a); [3] cf. *Warner* v. *War Contracts Price Adjust. Board*, 14 T.C. 1320, and *United States* v. *Warsaw Elevator Co.*, 213 F. 2d 517. This means all of petitioner's receipts or accruals of contract payments and all of its costs and profit figures on all of its business subject to the Act are lumped together so far as they are attributable to each year involved. It is obvious this permits excessive profits from one contract to be offset by deficient profits or losses from another.

As stated above, we have here stipulated figures of aggregate actual costs and aggregate profits realized by petitioner on the aggregate of its renegotiable business for each year involved. Our task is to determine on all of the facts, after consideration of the statutory factors how much, if any, of the profits realized by petitioner are excessive.

It is to be noted that in naming the factors to be considered in renegotiation the Act places special emphasis on the efficiency of the contractor, saying that it "must be" given favorable consideration "with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower * * *." Respondent takes the position that petitioner attained, at best, no more than average efficiency in its operations and is not entitled to favorable consideration under this factor.

Respondent argues that in the performance of most of its major contracts petitioner was inefficient in its operations; that the quality of its products was deficient; that it failed to reduce costs and was not economical in the use of materials, facilities, and manpower.

The evidence of record is overwhelmingly to the contrary. It shows that in each of these categories petitioner was at or near the top of the aircraft industry. Colonel Gerald F. Keeling, who, during 1953 and 1954, served respectively as technical adviser to the chief of procurement division of the Air Materiel Command and as deputy director of procurement and production of the American Air Force, when asked about North American's efficiency as a producer of airplanes in 1953 and 1954, testified that "North American's efficiency, both as to cost to produce and initial technical design far surpassed any other

---

[3] SEC. 105. RENEGOTIATION PROCEEDINGS.

(a) PROCEEDINGS BEFORE THE BOARD.—*\* \* \* The Board shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year (or such other period as may be fixed by mutual agreement) by a contractor or subcontractor under contracts with the Departments and subcontracts, and not separately with respect to amounts received or accrued under separate contracts with the Departments or subcontracts, except that the Board may exercise such powers separately with respect to amounts received or accrued by the contractor or subcontractor under any one or more separate contracts with the Departments or subcontracts at the request of the contractor or subcontractor.* \* \*

manufacturer." Lt. Gen. Clarence S. Irvine, who, during 1953 and 1954, was deputy commander for production of the Air Materiel Command, testified that as a producer of airplanes North American was the best—"From a standpoint of excellence in manufacturing procedures I would say they are within the top two or three. * * * I would say that there was no other airplane company better and few as good on an over-all standpoint." Lt. Gen. Lawrence C. Craigie, Deputy Chief of Staff of the Air Force, testified in 1953 and 1954 he rated petitioner "extremely high" as a producer of aircraft in this period and at "the very top group" of aircraft companies. An indication of the high regard in which petitioner was held by the Defense Department is found in the fact that its aircraft accounted for about 24 percent of all military airplanes and about 50 percent of all fighter type airplanes procured by the Government during the years in question.

Respondent contends that the airplanes built by petitioner, particularly Models F–86D and F–86F, which were produced in large quantities, the F–100, and some of the other Air Force and Navy models, were of inferior quality. The evidence as a whole refutes this contention. Petitioner's F–86 series pioneered in the field of modern fighter aircraft. They were used extensively in the Korean conflict with outstanding success and contributed largely to the air supremacy of the United Nations forces. The victory ratio of the F–86's over the Russian built MIG–15's was over 10 to 1. The F–86D was a single-place interceptor and the F–86F a fighter-bomber. They were both ordered in large numbers in 1953 and 1954 and were the backbone of the United States Air Defense for several years thereafter. The F–100 was the first operational airplane to exceed the speed of sound in level flight. Its advent is considered a milestone in the development of aviation. The FJ–2's and FJ–3's were rated as the best Navy fighters of their time. All of these airplanes admittedly fell short of perfection—and all of the witnesses agreed that no perfect airplane has ever been built—but they were the best of their types produced up to that time. Some of them were advanced models and embodied many new features and presented many new and difficult engineering problems. Frequent changes had to be made in each model to keep abreast of the rapid advancement of the art. As production continued petitioner's and the Government's engineers and scientists worked together constantly and under great stress to detect and correct the deficiencies and improve the performance capabilities of each model. We are satisfied that petitioner fully cooperated in these efforts and that it showed commendable diligence and resourcefulness in improving the quality and performance of its airplanes.

Respondent cites petitioner's failure to meet the production goals on some of its contracts as grounds for denying petitioner favorable consideration for efficiency in its operations. While it is true that many of the production schedules specified in the contracts were not met, it was not always the fault of the petitioner. The failure was due to numerous causes, such as structural modifications required by the Government, delays in delivery of engines or other essential components furnished by the Government and subcontractors, and other causes, some of which were not under petitioner's control. There is evidence, too, that the production schedules were known to be unrealistic and would require revision. The evidence does not show any serious delays in production occasioned by petitioner's lack of diligence or capability.

In our opinion, the evidence as a whole leaves no doubt that in 1953 and 1954 the petitioner maintained a high degree of efficiency in the manufacture of airplanes under its major contracts, and, accordingly, we have given petitioner favorable consideration under this factor.

The other statutory factors will be briefly discussed in the order in which they appear in the statute. "(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products."

It is to be observed we are dealing with actual costs and not estimated cost figures with respect to separate contracts that were the subject of negotiation between the contracting parties during the performance years. Here we have stipulated figures of actual costs of all renegotiable business of $576,809,063 in 1953 and $603,191,884 in 1954, and stipulated figures of profits of $44,577,143 in 1953 and $55,069,369 in 1954. As set forth in our findings, petitioner's unit cost of production decreased as production increased and on the whole, petitioner's costs of producing military aircraft were the lowest in the industry. As to the "reasonableness" of petitioner's profits it is enough to say this will be the ruling consideration in this proceeding. We have found that as to volume of production, petitioner utilized all of its plant facilities at near full capacity during 1953 and 1954 and produced nearly a fourth of the military aircraft procured by the Government during the years in question. Consideration of the subfactors of "normal earnings, and comparison of war and peacetime products" is not very illuminating here. As already pointed out, petitioner had no normal peacetime operations outside the field of manufacturing airplanes and other products for military use. "(2) The net worth, with particular regard to the amount and source of public and private capital employed."

Here, as in *Boeing Co.* v. *Renegotiation Board*, 37 T.C. 613, respondent's primary contention is that petitioner's profits are excessive

because they constitute an unreasonable return on book net worth. However, in our consideration of this factor we have done what we did in *Boeing*, namely, increased petitioner's net worth figure by the value of its design and manufacturing know-how, which we feel is of the value of all its book assets combined.

We have also considered large amounts of borrowed capital-interest bearing bank loans—not reflected in book net worth averaging $56,-500,000 in 1953 and 1954. We have also considered petitioner's use of leased and Government-furnished facilities. The record shows this is characteristic of the airplane industry where wide fluctuations in volume of business make large investments in facilities impracticable. This also is a cause of high return of income on book net worth. But this fact and the fact that petitioner received high progress payments tend somewhat to reduce the profit that should be allowed to be retained as reasonable in the renegotiation process. "(3) Extent of risk assumed, including the risk incident to reasonable pricing policies."

In our consideration of this factor we feel petitioner assumed no risk. Its pricing policies on which its major contracts were negotiated virtually insulated petitioner from any serious risk from that source. While petitioner did suffer losses on some of its contracts, its overall experience shows that the risks were comparatively inconsequential. "(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance."

Petitioner made varied and extensive contributions to the defense effort, the most important of which, perhaps, was the designing and production of a large number of superior fighter airplanes. Its F–86 fighter, which composed the major portion of its production in 1953 and 1954, was the backbone of the United States Air Force for a number of years. Petitioner's development of the F–100A, the first supersonic airplane, was a major step in aviation.

The evidence is that during 1953 and 1954, as well as in other years, petitioner made notable contributions to the defense effort in the superior quality of its products, its response to the demands for large volume production, its cooperation with the Government and the aircraft industry in solving engineering problems, its economies in the use of materials and manpower, and the development of improved manufacturing techniques. The rocket engine, which petitioner began developing in 1946, served a vital need of the Government in the field of missile development and space exploration.

Respondent would deny petitioner any credit whatsoever for contributions to the defense effort in the production of its airplanes in 1953 and 1954, because it was not performing a vital function. De-

scribing petitioner as a designer of "air frames" rather than "air-planes," respondent continues:

The distinction intended is not one solely of semantics since the airframe—which the petitioner and its subcontractors fabricated—was merely the envelope enclosing the propelling force and the myriad of equipment which are essential to make an airplane an effective combat instrument. * * *

The truth is that the building of airplanes, or "air frames," is a highly technical and complex operation. From the earliest sustained power flight there has been a more or less steady advance of the state of the art in air-frame design. This has been greatly accelerated at times by wartime and national defense compulsions. With military aircraft, especially, the demand for advancements in design and increased production have been pressing. Each forward step in design has given rise to new engineering problems.

Respondent contends that petitioner was uncooperative with Government representatives and intentionally withheld information or gave misleading information to the Government auditors and renegotiators. This contention is not only contrary to the weight of the evidence but, again, is inconsistent with respondent's requested findings of fact.

97. Petitioner benefitted [sic] by the immense amount of governmental assistance which was transmitted to the aircraft manufacturers. The effect was a team effort where governmental personnel, responsible for the development and production of aircraft, worked very closely with the contractor in providing assistance, exchanging information, participating in the programs and contributing to the progress and satisfactory development of the planes. * * *

Colonel Keeling described petitioner as "extremely cooperative and were willing to step out and fix things quickly." General Irvine testified that North American always reacted very fast in any way to improve its product; that "I think I can say without question that they had the fastest reaction of any engineering department in the aircraft industry"; and that he had less trouble and less cost to the Government in obtaining satisfactory solution of the inevitable problems with North American than with the other manufacturers. "(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over."

It is well established in the record that the manufacturing of airplanes of the types petitioner furnished, is a complex and difficult business. In its supersonic airplane activities and its rocket engine, missile, and atomic work it was exploring new and advanced fields. In all of its manufacturing activities, including its guidance systems, its production operations necessitated precision work with a flexible manufacturing operation that would allow changes for application of

new and improved techniques. Ordinary mass-production methods could not be employed to petitioner's type of manufacturing activities.

Petitioner complied with the Government policy with respect to subcontracting. It subcontracted about 25 percent of its airplane work.

Here the subfactor "rate of turnover" is mentioned. We assume this means inventory turnover. *La Grand Industrial Supply Co.* v. *United States*, 22 T.C. 1023. Consideration of this factor is of limited usefulness because of the nature of petitioner's operation. If we use the gross value of its inventories it had a relatively low inventory turnover: a little more than twice annually. But this does not mean much as petitioner received progress payments equal to about 70 percent of incurred costs and title to inventory items passed to the Government with such progress payments.

This petitioner has always had to rely on Government contracts for its very existence. It had practically no business with private customers. There is some merit to the observation made by respondent that in a sense the petitioner was virtually in partnership with the Government during all of its business life.

On giving consideration to the entire record and all of the facts in the light of the statutory factors, we feel that petitioner's profits on its renegotiable business for each of the years in question were to some extent excessive. It is our conclusion that petitioner realized excessive profits from its renegotiable contracts of $4 million in 1953 and $12,500,000 in 1954.

Reviewed by the Court.

*Decisions will be entered accordingly.*

---

WITHEY, *J.*, concurring: Because in my view this case is in principle indistinguishable on its facts from *Boeing Co.* v. *Renegotiation Board*, 37 T.C. 613, and for reasons set forth in *Boeing*, I concur in the result herein.