### MASON & HANGER–SILAS MASON CO., INC.

v.

### The UNITED STATES.

### No. 616–71.

United States Court of Claims.

June 25, 1975.

Reconsideration Denied Oct. 3, 1975.
See 523 F.2d 1384.

Numa L. Smith, Jr., Washington, D. C., attorney of record, for plaintiff. Emil V. Pilz, New York City, Barron K. Grier, James W. Midgley, Miller & Chevalier, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

BENNETT, Judge.

This renegotiation case comes before the court on appeal from the Trial Divi-

sion where findings and an opinion were filed August 9, 1974, by Trial Judge David Schwartz, pursuant to Rule 134(h). His decision has been reviewed on the briefs, exceptions, and oral argument of counsel. Upon consideration thereof, the court finds itself in agreement with major portions of that recommended decision and adopts them, with minor modification, as Parts I–VII and IX of its opinion. Most of the trial judge's findings of fact are also adopted, but with some modifications we deem proper upon consideration of exceptions by the parties. Our departure from the trial judge's analysis and conclusions is limited essentially to Parts VIII and X of this opinion.

## I

Plaintiff operates four Government-owned ammunition plants (called GOCO plants for Government-owned, contractor-operated) pursuant to contracts with Government agencies subject to the Renegotiation Act of 1951, as amended. Title I, ch. 15, 65 Stat. 7 (1951), as amended, 50 U.S.C. App. §§ 1211–24 (1970), as amended (Supp. II, 1972). The question for decision is whether the profits earned by plaintiff in 1967 were excessive under the Act and, if so, to what extent.

Two of the four plants are nuclear ordnance plants operated for the Atomic Energy Commission. In these plants plaintiff assembles the nuclear weapons stockpiled by the United States from high explosives produced at the plants and nuclear and other components supplied by the AEC through other GOCO contractors. The other two plants are conventional ammunition plants, operated for the Army Procurement and Supply Agency (APSA), in which plaintiff loads, assembles and packs a variety of ammunition products. In 1967 these plants were the major source of high explosive bombs used by the Air Force.

The financial basis of the operation of each plant is a cost-plus-fixed-fee contract under which the Government furnishes the plant and equipment and re-imburses all costs, except the cost of plaintiff's corporate overhead at its home office. Under the Army contracts, plaintiff was paid a fixed fee per unit of ammunition. Under the AEC contracts plaintiff was paid a single annual fee for management of the two plants.

The operation of the four plants represents approximately 99 percent of plaintiff's renegotiable business, which in turn is substantially all of plaintiff's business.

In 1967 plaintiff's total receipts subject to renegotiation were $112,931,469. After deducting from its fixed fees the $822,000 in nonreimbursable costs of overhead, plaintiff was left with net profits subject to renegotiation of $2,681,800. The percentage relationship of the profits to the receipts is 2.37.

The Renegotiation Act in its opening section declares it to be the considered policy of the Congress "in the interests of the national defense and the general welfare" to eliminate "excessive profits," "as provided in this title," from contracts made with the United States for procurement and construction for the national defense program. 50 U.S.C. App. § 1211 (1970). The Renegotiation Board, an agency created by the Act, is charged with the responsibility of recapturing excessive profits earned on these contracts, in practice the contracts of the military, maritime, space, aviation and atomic energy agencies and the General Services Administration. Provision is made for various exemptions and minimum profits not subject to renegotiation. On the basis of data required to be filed by each contractor who holds contracts or subcontracts subject to the Act, the Board negotiates with the contractor for a refund of excessive profits earned in a given fiscal year. If agreement is not reached, the amount of profit deemed excessive is determined by the Board in a unilateral order, 50 U.S.C. App. §§ 1212–17 (1970), as amended (Supp. II, 1972). A contractor aggrieved by such an order may within a specified period file a petition in this court for a redetermination of the amount of his excessive

profits. 50 U.S.C. App. § 1218 (1970), as amended (Supp. II, 1972).

▉ That is what happened here. The plaintiff, aggrieved by an order of the Board determining that it received excessive profits of $500,000 in 1967, has filed a petition under section 108 of the Act for a redetermination of the amount of its excessive profits. The nature of the proceeding and the determination are explicitly described in the Act: "The court may determine as the amount of excessive profits an amount either less than, equal to, or greater than that determined by the Board." 50 U.S.C. App. § 1218. The proceeding in the Court of Claims, the Act continues, "shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo." 50 U.S.C. App. § 1218 (1970), as amended (Supp. II, 1972); see *Lykes Bros. S.S. Co. v. United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972). The question now presented is thus not whether the Board was correct in its decision or can be shown to be incorrect, but rather an original question to be freshly determined, namely, what amount, if any, of plaintiff's profits in 1967 from contracts subject to renegotiation was excessive under the Act. While some of the evidence before the Board has been introduced in this proceeding, a trial *de novo* has been held, witnesses heard and exhibits introduced. The burden of proof of excessiveness rests on defendant. *Lykes Bros. S.S. Co. v. United States, supra.*

Plaintiff supports its position that its profits in 1967 were not excessive with contentions, among others, that it operated with high efficiency, made a substantial contribution to the defense effort, and that the 2.37-percent ratio of its profits to receipts was lower than the average profit ratio of GOCO ammunition plants. The Government's position is that the 80-percent increase in plaintiff's receipts, in 1967 over 1966, was brought about by an increased demand for ammunition for the war in Vietnam and that the resulting increase in profits, from the Army contracts, of 139 percent is disproportionate and is excessive by "not less than $500,000," the amount demanded in the Government's counterclaim.

## II

### Standards for Determining Excessive Profits

The Act defines excessive profits as that part of the profits determined to be excessive; no rate or formula for the determination is given, other than the further provision that in determining excessive profits "favorable recognition must be given to the efficiency of the contractor," briefly elaborated to refer to quantity and quality production, reduction of costs and economies in materials, "and in addition, there shall be taken into consideration" six stated "factors" in the contractor's operations: the reasonableness of his costs and profits, his net worth, risks assumed, contribution to the defense effort, character of business and, finally, "the public interest and fair and equitable dealing." Section 103(e), 65 Stat. 9, 50 U.S.C. App. § 1213(e) (1970).[1]

---

1. Section 103(e) of the Act provides as follows:
 "*Excessive profits.*
 "The term 'excessive profits' means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

 "(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;
 "(2) The net worth, with particular regard to the amount and source of public and private capital employed;
 "(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;
 "(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

No more precise standard than section 103(e) is to be found in any of the successive renegotiation acts, from the first enactment in 1942 to the last extension in June 1974.[2] The first act, indeed, contained little more than a mandate to the executive to recapture "excessive profits"; the statutory factors first appeared in the Second Renegotiation Act, in 1944.[3]

The Supreme Court nevertheless upheld the acts and their application to contracts made prior to enactment, in an opinion which furnishes a wide-ranging guide to the purposes of statutory renegotiation, the meaning, and the standards for the determination of "excessive profits."

■ Congress, the Supreme Court wrote, had in adopting statutory renegotiation rejected a rigid formula for excessive profits, proposed by amendment in the House,[4] "in favor of the more flexible definition embodied in the term 'excessive profits.'" *Lichter v. United States,* 334 U.S. 742, 773, 68 S.Ct. 1294, 1311 and n. 18. "Excessive profits," the court held, "are those in excess of reasonable profits." 334 U.S. at 786, 68 S.Ct. at 1317, quoting from *Spaulding v. Douglas Aircraft Co.,* 154 F.2d 419, 423 (C.A. 9 1946). How much profit was reasonable, and thus how much was excessive, the court concluded, is to be learned in the "purpose of the Renegotiation Act and its factual background," which "establish a sufficient meaning for 'excessive profits' as those words are used in practice." 334 U.S. at 785, 68 S.Ct. at 1317.[5]

From the extensive review by the Supreme Court of the factual background and purposes of the Act, it plainly appears that the premise of statutory renegotiation was that accurate pricing and the control of contractors' profits cannot

---

"(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;

"(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted."

**2.** Pub.L. 93–329, 88 Stat. 288 (1974).

**3.** 56 Stat. 226, 245–46 (1942). An administrative directive thereupon "promptly stated the factors to be stressed in determining excessive profits" (*Lichter v. United States,* 334 U.S. 742, 773–74, 68 S.Ct. 1294, 1311, 92 L.Ed. 1694 (1948)). *Principles, Policy and Procedure To Be Followed in Renegotiation,* War Dept. Price Adjustment Board, August 10, 1942, reprinted in *Hearings Before the Subcomm. of the Senate Comm. on Finance on Sec. 403 of Pub.L. No. 528,* 77th Cong. 2d Sess. 28, 34–43 (Sept. 29 and 30, 1942).

A more detailed directive followed in 1943 which "contributed definiteness to the current administrative practice" (*Lichter v. United States, supra,* 334 U.S. at 778, 68 S.Ct. at 1313). *Joint Statement by the War, Navy and Treasury Departments and the Maritime Commission—Purposes, Principles, Policies and Interpretations Under Sec. 403 of the Sixth Supp. National Defense Appropriation Act of 1942, as Amended by Sec. 801 of the Revenue Act of 1942 (Public 753, 77th Cong.), Oct. 21,* 1942, March 31, 1943, reprinted in 2 *Hearings Before the House Comm. on Naval Affairs on H.R.Res. 30,* 78th Cong., 1st Sess. 469, 1025–39 (1943). The substance of the factors for determining excessive profits stated in the "Joint Statement" was in 1944 incorporated by Congress into the Second Renegotiation Act, and is the source of section 103(e) (note 1, *supra*) of the present Act. Section 701(b)(4)(A), Revenue Act of 1943, ch. 63, 58 Stat. 21, 78–92, 79 (1944); *Lichter v. United States, supra,* 334 U.S. at 783, 799, 68 S.Ct. 1294.

**4.** The formula rejected would have required "reimbursement of profits in excess of 6 percent" on contracts for military or naval supplies. 88 Cong.Rec. 3139–140 (1942).

Limitations on profits in Government contracts to build ships and aircraft, of 10 and 12 percent, respectively, were enacted in the Vinson-Trammell Parity Act of 1934 and the Merchant Marine Acts of 1936. The present Renegotiation Act of 1951 explicitly suspends these statutes. 50 U.S.C. App. § 1212(d) (1970).

**5.** Judicial determinations of excessiveness were, the court implied, nothing new, pointing to the prohibitions of both excessive bail and fines in the Eighth Amendment to the Constitution. The reasonableness of rates, returns on investment, compensation for services, costs and depreciation allowances—all are committed by statute for decision by judges. 334 U.S. at 785–86, 68 S.Ct. 1294.

be achieved during a build-up of production for defense of war. The purpose was, therefore, to control by recapture the skyrocketing profits on goods produced for war and national emergency without impeding either the volume or efficiency of that production.

The experience in World War II was that war or emergency tends to create "a demand for production of war supplies in proportions previously unimagined" and "at an undreamed of speed," whose result is unacceptably high profits, in a word, profiteering. The combination of the needed speed, the rise in demand and the all but exclusive interest of procurement officers in volume of purchases overwhelm careful cost analysis and forecasting, especially in cases of new and improved products, drawn-out negotiations and the other characteristics of sound purchasing in peacetime. As competition wanes, profits go up to levels damaging to the morale of the armed and civilian forces, excessively costly to the public treasury and productive of still further inflation in costs and profits. 334 U.S. at 763–64, 768–69, 68 S.Ct. 1294.[6]

The experience in World War II was not unique.[7] The same conditions, returning during the time of production for the Korean crisis, caused the enactment of the Renegotiation Act of 1951, presently being applied, H.R.Rep.No.7, 82d Cong., 1st Sess. 1–2, 2 U.S.Cong. & Adm.Serv. 1339 (1951); see (now Mr. Justice) R. Braucher, *Renegotiation Act of 1951*, 66 Harv.L.Rev. 270, 270–80 (1952). And in 1966, shortly before the year of the profits now under review, Chairman Wilbur K. Mills of the House Ways and Means Committee advised the Congress that the enormous defense program in consequence of the war in Vietnam had resulted in such "attenuation of normal competitive forces" as required an extension for 2 years of the Renegotiation Act of 1951. The details he gave, quoted in the footnote,[8] tell essentially

**6.** Under Secretary of War Robert P. Patterson, in an affidavit sworn to on August 3, 1945, and quoted in *Lichter v. United States, supra,* 334 U.S. at 762 n. 7, 68 S.Ct. at 1305, said:

"The necessary result of this combination of circumstances is that the war procuring agencies cannot use normal methods of procurement. The pressing need for speed requires the abandonment of drawn-out negotiation and the careful surveys of all relevant factors which sound purchasing would otherwise require. Competition necessarily wanes and no longer offers an adequate guide to the prices which should be paid. Above all, the forecasting of costs of production becomes, in large measure, a matter of informed guessing rather than of real cost analysis. This is true in the case of new products, new plants, and new producers; it is likewise true, though perhaps to a lesser degree, wherever the quantities to be manufactured are sharply increased over pre-war amounts. Accordingly, advance prices quoted in good faith by manufacturers in a large number of cases have little relation to costs actually experienced in the course of production. * * * "

**7.** High profits on goods for use in war are endemic in all periods. But they reached new heights in World War I. The 1942 Act was enacted on April 28, 1942 (56 Stat. 226, 245–46), not long after Pearl Harbor and shortly following a Supreme Court decision telling of a 22-percent profit on shipbuilding in World War I, exclusive of payments to affiliates and Government financing of plant expansion. *United States v. Bethlehem Steel Corp.,* 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942). *See* (Senator) D. I. Walsh, *War Profits and Legislative Policy,* 11 U.Chi.L.Rev. 191 (1944) (quoting General Washington's bitter complaints against profiteers in 1779); H. S. Hensel & R. G. McClung, *Profit Limitation Controls Prior to the Present War,* 10 Law & Contemp.Prob. 187 (1944).

**8.** Addressing the Committee of the Whole House in support of the extension of the Act, Chairman Mills said in part, as follows (112 Cong.Rec. 13289–290 (1966):

"The central truth, as I see it, is there is simply no traditional marketplace to guide pricing for a large part of the defense and space procurement. The Navy cannot go out in the ordinary marketplace and buy a Polaris missile. NASA cannot buy commercially a Surveyor or an Apollo.

"With the elements of cost uncertainty, product complexity, and huge dollar commitments, the Government procurement market is fundamentally different in many respects and in many instances from the private competitive market. This unique set of characteristics provides the economic basis for renegotiation. Here, in summary form, are the six points I make for the necessity of the process.

* * * * * *

the same story as motivated the passage of the first renegotiation law in 1942.

Above all, the Supreme Court held in *Lichter,* "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." 334 U.S. at 785, 68 S.Ct. at 1316. Accordingly, since 1942 the successive renegotiation acts have rejected any method, other than by application of the statutory factors, for the determination of excessive profits.

■ Renegotiation, so adaptable to the facts of each case, recognizes that a fair rate of profit on the manufacture of one commodity may be entirely inadequate for the manufacture of another; that even within the same industry differences among enterprises may make significant differences in the profit to be considered reasonable.[9] A fixed formula for all cases would ignore all such differences and reward the efficient, low cost producer, equally with the inefficient, high cost producer, those who contribute to the defense effort the same as those who do not.

■ The statutory factors, on the other hand, provide for all the possible differences in cases—the character of the business, its efficiency, the contribution to the defense effort, the net worth and capital employed, the risks assumed, the reasonableness of costs and profits and any others required to do equity and serve the public interest. No single fact or factor is determinative. All the facts must be taken into account, all the statutory factors considered.[10] The consideration given each statutory factor must be weighed with the others specified and with any other factors required by the

"*First.* The bulk of Government procurement is made on the basis of negotiated prices, without market prices to guide the negotiators.

"*Second.* Price competition over a substantial part of the Government procurement market, including the successive subcontract tiers, is weak, and at times nonexistent.

"*Third.* Cost estimates are characterized by a high degree of uncertainty, particularly for new products and systems, with the result that initial prices or targets are frequently wide of the mark.

"*Fourth.* Negotiated prices are often influenced by an imbalance in negotiating skill, in favor of the industry negotiators.

"*Fifth.* Major Government contractors often work with Government plant, equipment, progress payments, and other forms of Government financing, and substantial differences exist among the contractors in the extent of subcontracting.

"*Sixth.* Government business is negotiated on a contract-by-contract basis, each contract being negotiated independently of others and without reference to the financial outcome of the other contracts. I have been told recently of one instance of a contractor holding 500 different contracts, awarded by 100 different contracting officers in 54 different procurements offices.

"In my judgment, these complex circumstances indicate our enormous defense program cannot be carried out with any assurance that the resulting profits will not exceed the bounds of fairness and reasonableness. The after-the-fact review provided by renegotiation is essential to fill the void left by the attenuation of normal competitive forces."

9. " * * * Even within the same industry a company with a new modern plant, fitted out with new machinery, arranged with a view to the most economical production, and all provided by the government, is not entitled to the same rate of profit as one that produces the same articles in an old plant, perhaps not designed in accordance with the latest ideas for the most efficient production, but all provided by the contractor without government aid. * * *." C. G. Blough, *Renegotiation Standards and Practices,* 10 Law & Contemp.Prob. 276, 295 (1944).

10. The regulations of the Board, unchanged in this respect since adopted in 1952, provide that (17 Fed.Reg. 2530 (March 25, 1952), 32 C.F.R. § 1460.8(a) (1973)):

"Reasonable profits will be determined in every case by over-all evaluation of the particular factors present and not by the application of any fixed formula with respect to rate of profit, or otherwise. Renegotiation proceedings will not result in a profit based on the principle of a percentage of cost. Contractors who sell at lower prices and produce at lower costs through good management, including conservation of manpower, facilities and materials, improved methods of production, close control of expenditures, and careful purchasing will receive a more favorable determination than those who do not. Such favorable or unfavorable determination will be reflected in the profits allowed to be retained by the contractor or subcontractor as nonexcessive. * * *."

public interest and the principles of fair and equitable dealing. Note 1, *supra*.

## III

### Character of Business

Though near last in the list of factors in section 103(e) (note 1, *supra*), the character of the contractor's business is considered first, as a setting for the application of all the factors.

Plaintiff's earlier work of designing and building ammunition plants for the Government led to its undertaking the operation of the four GOCO plants which became substantially its sole business. The Army's GOCO ammunition plants were the response to the need for a production capacity ample for defense or war. The creation of the needed capacity required larger amounts of capital than private industry was willing to invest in a business which enjoyed doubtful public approval and would be subject to a sharply fluctuating demand for its products. Accordingly, before and during World War II the Government embarked on a program of building such plants at public cost. At the end of World War II there were 84 GOCO plants in existence.

GOCO plants continued to be built and operated during the Korean and Vietnamese wars, and since.[11] In 1967 there were 34 GOCO ammunition plants operated for the Department of Defense, 26 of them for the Army Procurement and Supply Agency. Among the latter were the two conventional ammunition plants operated by the plaintiff.

AEC-owned GOCO plants date from the earliest days of nuclear weapon production, when both public and private efforts were joined for the development of the nuclear bomb. Under successive atomic energy acts, the AEC has since developed the concept of a management contract for operation of AEC-owned facilities, exemplified in the contracts for the two AEC plants operated by plaintiff, under which a single fee is paid, annually, for the operation of the facility. See O. S. Hiestand, Jr., and M. J. Florsheim, *The AEC Management Contract Concept*, 29 Fed.Bar J. 67, 69–70 (1969).

In 1967 the AEC owned a wide variety of technical service and manufacturing facilities operated for it by 40 prime contractors employing over 106,000 persons. Of these facilities 26, among them the two plants presently under consideration, represented investments in excess of $25 million each. *Annual Report to Congress of the Atomic Energy Production Commission for 1967*, 281, 317–21.

The work at the two AEC plants operated by plaintiff consisted primarily of the assembly of nuclear weapons from high explosives produced at the plants and combined with nuclear, firing and fusing components and casings furnished by the Government or purchased from other GOCO or private plants; in addition, 20 percent of the work consisted of the maintenance and testing of stockpiled nuclear weapons; and 10 percent was research and development.

The work of the two Army plants, called Cornhusker and Iowa, is the loading, packing and assembly of 500-, 750-, 1,000- and 2,000-pound bombs, large caliber artillery projectiles and aerial antipersonnel mines, at Cornhusker, and of projectiles of various lesser calibers ranging from 76 to 175 mm. and a variety of such items as warheads, igniters, grenades and mines at the Iowa plant. As in the AEC plants, high explosives are formulated at the plants and casings and other components are supplied.

The Cornhusker plant was, in 1967, the only producer of the 750-pound bomb and an antipersonnel aerial mine containing a particularly sensitive explosive. Nine million of these mines were produc-

---

11. A Government-owned "national reserve of industrial productive capacity" to supply the needs of the armed forces in anticipation of and during wartime was provided for in the National Industrial Reserve Act of 1948, ch. 811, 62 Stat. 1225. 50 U.S.C. §§ 451–62 (1970).

ed under a program newly begun in that year.

The four plants are a vast enterprise. The Iowa Army plant and one of the AEC plants together occupy a tract of 19,136 acres near Burlington, Iowa, with 150 miles of road, 102 miles of railroad, and 1,042 buildings housing 4 million square feet of floor space. The other AEC plant, near Amarillo, Texas, occupies 10,200 acres and 80 buildings with 700,000 square feet of floor space. The Cornhusker Army plant, at Grand Island, Nebraska, occupies almost 12,000 acres and 649 buildings with 2.3 million square feet of space. In 1967 the work force at the four plants averaged 11,193 persons; the 363 professional employees included 151 engineers, divided among civil, mechanical, electrical, chemical and industrial and quality control, 33 chemists and biologists and 32 physicists and mathematicians.

The estimated replacement value of the Iowa Army plant is $66 million; that of the Cornhusker plant is $31.5 million. Each of the AEC plants, as noted, represents an investment "in excess of" $25 million.

The contracts of the AEC and the DOD plants, while all of the cost-plus-fixed-fee type, are significantly different. "AEC has a different view of its GOCO operations than DOD and calls them 'management contractors'." 1 Report of the Commission on Government Procurement 66 (1972). For the management of both AEC plants plaintiff in 1967 was paid a single annual fixed fee of $864,000 plus $16,640 as a fixed fee for additional construction at one of the plants, a total of $880,640. The basic contracts for the operation by plaintiff of the Army plants do not provide for a fee. Orders are placed for particular items of ammunition on the basis of estimates of cost and are then added to the contract by amendment. Each such amendment provides for an agreed fixed fee per unit of ammunition produced, called a unit production fee. For each

175-mm. shell produced, for instance, plaintiff was paid $0.27. One of the contracts, for the Cornhusker plant, also provides for an award fee for superior performance, payable in the discretion of APSA.

All costs, with an exception noted below, are borne by the Government or defrayed by the supply of materials used or equipment needed. Costs at the AEC plants are prefinanced by a letter of credit against which plaintiff draws. At the Army plants, costs are reimbursed promptly after expenditures, within the week, although the contract requires reimbursement only monthly. Fees are paid promptly. Plaintiff is thus enabled to operate with a very small amount of working capital at the plants. Plaintiff's surplus, total assets and net worth are $5.7 million, $6.3 million and $6.0 million, respectively.

The only cost which is not reimbursed is the cost of plaintiff's corporate overhead at its home office. The home office is headed by a chairman, president, and executive vice-president, who own 88 percent of the outstanding stock of the plaintiff corporation and are paid total salaries of $225,000. No question has been raised as to the reasonableness of salaries paid by plaintiff.

■ The four plant managers report to the chief engineer and vice-president in charge of operations, an officer other than the executive vice-president. The functions of the home office are overall supervision of plant managers, the negotiation of Government and labor contracts, the formulation of corporate policy, and the provision of services for the guidance of the four plants in areas of labor relations and safety. The costs of the home office and other nonreimbursable corporate costs (chargeable to plaintiff's renegotiable contracts) in 1967 amounted to $822,000 and were absorbed by plaintiff's fixed fees. The renegotiable profit of $2,681,800 mentioned above is net after nonreimbursable costs.[12]

12. Taxes, it may be mentioned, play no part in this proceeding. The renegotiable profit is to

be passed upon herein for excessiveness without consideration of taxes already paid on

Specifically mentioned in the statutory statement of the factor of "character of business" are the "source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting and rate of turn-over." Sec. 103(e)(5), note 1, *supra.* Calculation of a rate of turn-over is not warranted by the state of the record and the nature of plaintiff's business; each of the other aspects of plaintiff's business will be briefly considered.

a. *Source and nature of materials.* The "nature" of the materials used at the plants is noteworthy; large quantities of high explosives are components of the ammunition loaded by plaintiff. So far as the record shows, materials otherwise present no problems for plaintiff. Materials are either supplied to plaintiff directly by the Government or obtained from other GOCO or private contractors. While the record contains little data on the point, it may be assumed that the Government assured plaintiff of adequate supplies of bomb casings, atomic warheads and the materials necessary for the fabrication of the high explosives to be loaded.

The regulations of the Renegotiation Board provide that the contractor who uses customer-furnished materials generally is not entitled to as large a dollar profit as the dollar profit to which such contractor would have been entitled had it furnished the materials itself. 32 C.F.R. § 1460.14(b)(2) (1973), hereafter cited as "Regulations." [13] The contractor who furnishes his own materials, the regulation notes, has "expended effort in finding or acquiring the materials, would have invested capital in the materials and would have assumed the risks of obsolescence, spoilage, or other loss inherent in owning such materials." Plaintiff has in all likelihood not expended such effort, and it has not made such investment or assumed such risks.

b. *Character and extent of subcontracting.* Plaintiff did not subcontract any of the work at the AEC plants; at the Army plants, subcontracting was minimal and was estimated at 5 percent or less. The work at both the plants is in the main delicate and complex, and the amount of possible subcontracting was no doubt a function of the work and closely controlled by the contracting agencies.

c. *Complexity of manufacturing technique.* "The manufacturing contribution will vary with the nature of the product and the degree of skill and precision required in the work performed by the contractor. The relative complexity of the manufacturing technique and the relative integration of the manufacturing process are the basic considerations in evaluating this factor." Regulations, § 1460.14(b)(1).

It is abundantly clear that the manufacturing techniques employed in the four plants are highly complex, the products must meet high standards, and that plaintiff adds great value to the materials used. Plaintiff is deserving of favorable consideration for its substantial manufacturing contribution, which will

such profits. Determinations of excessive profits, if any, are made on profits before taxes, and judgments are credited for taxes already paid. 50 U.S.C. App. § 1215(b)(8) (1970); Int.Rev.Code of 1954, § 1481(b); 26 U.S.C. § 1481(b) (1970).

**13.** The regulations of the Renegotiation Board under the Renegotiation Act of 1951, found in Title 32 of the Code of Federal Regulations at § 1450 *et seq.,* were adopted pursuant to authority conferred in section 109 of the Act, 50 U.S.C. App. § 1219 (1970). The regulations cited and relied upon herein reasonably elaborate themes immanent in the statute itself, and it is therefore not necessary to decide whether they are binding, in this de novo determination, to the extent other regulations would be on judicial review of agency action. *Compare Albemarle Paper Mfg. Co. v. Renegotiation Bd.,* 35 T.C. 438, 443 (1960), and *Metallurgical, Inc. v. Renegotiation Bd.,* 35 P–H Tax Ct.Mem. 66,687 at 66,693, ¶ 66,114 (1966), *petition for rev. dismissed,* 382 F.2d 843 (C.A.8 1967), with *Spray Cotton Mills v. Secretary of War,* 9 T.C. 824, 830 (1947), and *Psaty & Fuhrman, Inc. v. Henry L. Stimson,* 11 T.C. 638, 643 (1948), *petition for rev. dismissed,* 182 F.2d 985 (C.A. D.C.1950).

be further discussed with, and treated as part of, the factor of its efficiency.

## IV

### Efficiency

Efficiency is the only factor for which "favorable" recognition *must* be given; all the other factors are to "be taken into consideration." Sec. 103(e), note 1, *supra.* Special emphasis, therefore, is given to efficiency, by both the Renegotiation Board and the courts. *North Am. Aviation, Inc. v. Renegotiation Bd.,* 39 T.C. 207, 226 (1962); *cf. Boeing Co. v. Renegotiation Bd.,* 37 T.C. 613, 631–41 (1962), *petition for rev. dismissed,* 325 F.2d 885 (C.A.9 1963), *cert. denied,* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964).

The overall judgment of the reporting agencies on plaintiff's efficiency was highly approving.

The AEC's renegotiation affairs officer reported that "there has been a continued improvement in services and performance of work" and that plaintiff's "performance record in 1967 was considered satisfactory and the overall objective (including that of economics [*sic*] performance) had been achieved." The general manager of the AEC wrote to the Board that plaintiff had "performed an outstanding management service" and had made contributions "exceptionally important in the manufacturing of a better quality product."

The APSA report on the Iowa plant stated that "[t]he contractor's overall performance for the period under consideration has been most satisfactory." For the Cornhusker plant, the report was that "performance from a production viewpoint has been very good." At that plant, plaintiff received an award fee of $53,449, payable in APSA's discretion; the amount represents 30.3 percent of the potential maximum of such fees.

a. *"Quantity * * * production."* Sec. 103(e), note 1, *supra.* Quantity production is in the regulations related to "available physical facilities; meeting of production schedules; expansion of facil-

ities; maximum use of available production facilities." Regulations, § 1460.-9(b)(1).

The level of production at the plants was high in relation to physical facilities. The APSA report on the Cornhusker Army plant states that "[i]n 1967, as a result of the war in Southeast Asia, Cornhusker AAP was operating at full capacity."

The report on quantity production at the Iowa Army plant is as follows:

*Level of Production:* Loading, assembly, packing (LAP) operations in the calendar year involved the production of 40 to 45 different items, many of them new items. Nine of the 11 lines were in operation for 2 months of the year and 10 of the 11 lines operated for the other 10 months. Most of the lines were operating on a two to three shift basis. In addition to the support activities, routine maintenance work, facilities expansion and reactivation of production lines performed by the contractor, the design, fabrication and procurement of loading and assembly equipment for new items was at a very high level.

b. *Production schedules.* At the Cornhusker Army plant "[d]elivery schedules were met although frequent changes were made by the Government with little advance notification." At the Iowa Army plant delivery schedules "were generally met"; the instances of failure were a result of nonavailability of Government-furnished metal parts.

c. *Expansion of facilities and maximum use of production facilities.* In the period of less than 2 years between the latter part of 1965 and the end of 1967, plaintiff brought the Cornhusker plant from a "mothballed" status to "full capacity" and the Iowa Army plant from a "low, sustaining basis" to a "very high level." The Army authorities were apparently completely satisfied with the rate of expansion of facilities brought about by plaintiff and the rate of use in 1967.

d. *Quality production.* Section 103(e), note 1, *supra.* Three areas rele-

vant to consideration of quality production, given in the regulations, are maintenance of standards of quality, rejection record, and difficulties in the use of installation of the product. Regulations, § 1460.9(b)(2).

There is no evidence of any difficulties in the use of the product in the field suggestive of any lack of quality of the products of the plants. The evidence as to maintenance of quality standards and rejection record is affirmatively favorable to plaintiff. The APSA reports state:

At Cornhusker:

Rejection and spoilage rates are considered low.

At Iowa:

Rejection and spoilage rates were kept to a reasonable and acceptable level. The introduction of new items and extremely rapid expansion of production schedules with the inherent increase in training of personnel, defective metal parts and numerous changes in specifications, caused an increase in spoilage rates.

Labor relations, recruitment efforts and personnel policies were good:

At Cornhusker:

There have been no strikes, stoppages, or other significant developments in labor management affecting contractor performance.

At Iowa:

Contracts were negotiated with all unions during 1966 for a period of 3 years. There were no strikes or work stoppages during the period of this report. Joint labor-management meetings were held monthly to discuss problems that had arisen thus providing a continuous channel of communication. Difficulties have been experienced in the recruitment of personnel due to the rapid buildup of production and production schedules and tight labor market. However, contract performance has not been affected to any substantial degree in this area.

e. *Reduction of costs, and economy in the use of materials, facilities, and man-* *power.* "Costs" of the contractor are mentioned twice in the statutory factors, once under the factor of efficiency, in the phrase "reduction of costs, and economy in the use of materials, facilities, and manpower," and again in the statement of the factor of "reasonableness of costs and profits." Sec. 103(e), note 1, *supra.*

Plaintiff incurs two kinds of costs—its own costs of corporate overhead, not reimbursed by the Government, and the operational costs of production, all reimbursed to it. It will be both convenient and responsive to the differing emphasis in the two uses of the word "costs" to allot the reimbursed costs to the discussion, here, of "reduction of costs," and to reserve discussion of plaintiff's nonreimbursed costs for the treatment, below, of the "reasonableness of costs and profits."

Cost savings by plaintiff were reported as follows:

The report by the general manager of the AEC:

During this period, Mason & Hanger-Burlington effected cost reductions in the amount of $570,400 of which $55,600 was applicable to the first half and $514,800 was applicable to the second half of the year. During the same year, the Pantex plant effected cost reductions in the amount of $1,158,000 of which $831,000 was applicable to the first half and $327,000 was applicable to the second half of the year. These cost savings have been verified by the AEC as actual cost savings for the period.

The APSA report on Cornhusker:

Through Value Engineering, a new and improved method of coating the interior of bomb casings was developed and put into use as well as other developments to improve melt loading techniques.

The APSA report on the Iowa plant:

[The contractor] has made effective use of Value Engineering validated cost reduction savings in the amount of $275,700.00 for calendar year 1967.

Matters relating to economies in materials are discussed in the APSA report on Cornhusker:

The contractor is considered average in controlling the use of materials, facilities, manpower and production costs.

The adequacy and reliability of the contractor-provided cost information has been average to above average compared to other GOCO contractors.

The contractor is an average cost producer. Contract costs are based on product unit cost estimates submitted by the contractor and reviewed by the Government. Revised estimates are prepared whenever a fund deficiency or excess funding is indicated and the contract amount is adjusted accordingly. Upward revisions have generally been due to schedule changes and/or slippages in Government-furnished components.

The report on the Iowa plant states:

The contractor has utilized materials, facilities, and manpower in a satisfactory and economical manner and has been reasonably effective in controlling production costs.

The adequacy and reliability of the contractor-provided cost information has been average to above average compared to other GOCO contractors.

The contractor is an average cost producer. Cost overruns were caused in most instances by unforeseen problem areas, primarily new items and additional work and changes in specifications after the original estimates and funding were provided. Cost underruns were caused primarily by rapid increase in the volume of production and the resulting decrease of overhead applied. This factor is involved in both underruns and overruns since the overhead fluctuates with the volume of production. Another cause for overruns and underruns is inaccurate estimates for the new items for which no prior experience or historical data is available.

■ The less than high praise in these last-quoted opinions—that plaintiff was "average to above average" and "reasonably effective" in this area—does not lessen what is otherwise a high mark for efficiency. The relationship of cost estimates to actual costs is not necessarily significant in determining efficiency. Regulations, § 1460.9(b)(5)(*b*). Such cost overruns and underruns as occurred, it appears, were for causes not the fault of the plaintiff. In wartime, "average to above average" control of costs of materials may be a substantial achievement. Materials incorporated into the ammunition produced at Iowa and Cornhusker, moreover, were in all likelihood available only at prices not within plaintiff's control.

The overall conclusion as to the factor of efficiency is that plaintiff is entitled to favorable recognition for a high degree of efficiency.

V

*Contribution to the Defense Effort*

Section 103(e)(4), note 1, *supra*, calls for consideration of the—

[n]ature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance.

■ The APSA report on the Iowa plant states that the contractor made a contribution to the defense effort "by virtue of his operation of this plant by producing acceptable ammunition and ammunition components for the Armed Forces." The contractor who performs a defense contract does not by that token make a contribution within the meaning of the Renegotiation Act. Favorable consideration is rather due a contractor for "superior performance" or "performance, assistance or service considered otherwise exceptional"; illustrations are "completion of urgent work ahead of schedule, or exceeding specifications" with benefit to the defense effort, "inge-

nuity in providing new uses" for products or equipment, "overcoming difficulties, which others have failed to overcome," or "experimental and developmental work of value to the defense effort," "new inventions, techniques, and processes of unusual merit," work under difficult or hazardous conditions, cooperation with the Government and with other contractors. Regulations, § 1460.-13(b).[14]

a. *Inventive and developmental contribution.* At the Cornhusker plant, as is shown in the quotations, above, from the APSA reports, plaintiff developed improved techniques for melt-loading ammunition and for coating bomb casing interiors. The APSA report on the Iowa plant implied that contributions were made at that plant also; the report speaks of Value Engineering cost savings and, also, states that "the design, fabrication and procurement of loading and assembly equipment for new items was at a very high level."

The renegotiation affairs officer of the AEC who is quoted above reported to the Renegotiation Board that "the contractor did not make an outstanding contribution to the defense effort in 1967." The foregoing opinion, under date of October 15, 1968, was contradicted, with supporting detail, in a second letter, from the general manager of the AEC to the Board on April 8, 1970, written apparently when plaintiff's profits for 1967 were under review by the Board at a high level.

The general manager stated that he wrote to advise the Board of "areas in which credit should be given to [plaintiff] for production engineering and related activities." The plaintiff, he said, has a high degree of expertise, some of which "pushes the state-of-the-art" and

is not available elsewhere except in the AEC's design laboratories, consisting of "scientific and engineering knowledge and know-how in the various technologies associated with the fabrication of high explosive parts and assembly of nuclear weapons." This expertise, he continued, was relied upon by the AEC for the development of techniques and manufacture of equipment to meet the specifications produced in AEC laboratories. He enclosed a list of examples illustrating his conclusion that plaintiff's "ideas, suggested changes and development of processing techniques * * * [have] been exceptionally important in the manufacturing of a better quality product."

The opinion of the general manager is not challenged by the Government as defendant, and is here accepted as an expert and authoritative affirmation of the plaintiff's inventive and developmental contribution to the defense effort. The letter, so far as it goes, must be taken, too, as a reconsideration and retraction of the earlier judgment that plaintiff did not make an outstanding contribution to the defense effort.

On the basis of the reports from APSA and the general manager's letter, plaintiff is entitled to favorable consideration, in the words of the regulation, for "experimental and developmental work of high value to the defense effort," if not also for "new inventions, techniques, and processes of unusual merit." Regulations, § 1460.13(b).

b. *Cooperation with the Government and other contractors.* It may be doubted whether a contractor whose costs are being paid by the Government deserves special consideration for cooperation with the Government. In fact, however, plaintiff did cooperate with other GOCO contractors and with several foreign

---

14. The text summarizes a detailed regulation on the subject of contribution to the defense effort adopted by the Renegotiation Board in 1973 to express more specifically the need for exceptional contribution as distinguished from routine contribution. 38 Fed.Reg. 6390, March 6, 1973. The former regulation, in force from 1960 to 1973, stated, more briefly, that

"[f]avorable consideration for unusual contributions will be possible only when the contribution is exceptional," and gave as examples experimental and developmental work of high value, new inventions of unusual merit and cooperation with the Government. 32 C.F.R. § 1460.13(b) (1967).

governments, rendering technical assistance or advice in connection with ammunition production.

c. *Work under difficult and hazardous conditions.* Plaintiff's work, involving the handling of large quantities of high explosives, is necessarily dangerous. There is inevitable, constant risk of explosion, despite all training programs and accumulated experience in safety techniques. Plaintiff's personnel, however, not its' corporate treasury, bears the risks. The financial risk, as is held below in the discussion of the statutory factor of extent of risk assumed, is borne by the Government.

■ Nevertheless, without detraction from the principle that only exceptional contributions are recognized favorably, a substantial contribution to the defense effort is made by an organization whose several thousand members constantly work with large quantities of high explosives, producing, at rapidly increasing and near full capacity, "major caliber" projectiles, bombs and mines in large numbers, among them new and developmental items, and in this work perform in a "most satisfactory" and "very good" manner. As the Tax Court has said, the contemplated "contribution" includes "not only services performed without compensation, but the cooperative and enthusiastic performance of that work, and, in addition, the importance of the product produced and the services rendered, even though paid for, to the defense of this country." *Boeing Co. v. Renegotiation Bd., supra,* 37 T.C. at 645.

It is therefore concluded that plaintiff made a contribution to the defense effort in this area, too.

Overall, it is plain, plaintiff made a substantial contribution to the defense effort, for which it is entitled to favorable consideration.

## VI

### Extent of Risk Assumed

This factor includes the "risk incident to reasonable pricing policies." Sec. 103(e)(3), note 1, *supra.* The regulations

speak, in addition, of such other risks as guarantees of quality or of delivery schedules, risks of loss of civilian markets or of heavy reconversion expenses and risks from subcontracting. Regulations, § 1460.12. None of these risks is taken by the plaintiff in its business, in any appreciable degree.

Risk may be a major factor in competitively bid contracts where the contractor usually binds himself to sell, at a fixed price, goods yet to be produced from materials or sources which have not been used before. In cost-plus contracts such as are here involved, however, such risks are not present. The performance reports from both APSA and the AEC agreed that plaintiff assumed no risk in the performance of its contracts. APSA contracted with plaintiff on the assumption that plaintiff bore no risk.

Risk is practically eliminated in GOCO contracting. The Government supplies and risks the capital. None of the "sales" of the GOCO contractor is made at a fixed price; costs are reimbursed and profit margins assured. The Government arranges for the supply of components and bomb casings, and risks associated with procurement of materials are not present and in any event the financial consequences of such possibilities are assumed by the Government. There is no risk when capital is supplied and substantially all costs are paid by the Government. *Cf. North Am. Aviation, Inc. v. Renegotiation Bd., supra,* 39 T.C. at 229; *Boeing Co. v. Renegotiation Bd., supra,* 37 T.C. at 643.

Some risks of losses other than those mentioned above are alleged by plaintiff to have affected its capital needs; these are discussed in connection with the net worth factor, immediately following. Still other, miscellaneous risks allegedly assumed were insubstantial. A claimed risk of strikes, for instance, upon which the plaintiff's work would be given to another GOCO plant, was in fact negligible in 1967 and to the extent it existed it was a risk only of the loss of profits such

as comes on a termination of the contract.

Plaintiff is not entitled to favorable consideration by reason of risks assumed.

## VII

### Net Worth

The second numbered statutory factor in section 103(e)(2) (note 1, *supra*), is—

[t]he net worth, with particular regard to the amount and source of public and private capital employed; * * *.

The plants operated by plaintiff were built by the Government. All equipment was supplied, large portions of the materials used for the finished product were furnished, and the costs of the remainder —indeed, all costs except $822,000 of plaintiff's corporate overhead and home office—were borne by the Government.

Reimbursement by the Government of costs was exceedingly prompt. The AEC prefinanced costs by providing a letter of credit against which plaintiff drew as it needed money to pay salaries and bills. The Army, bound by contract to make reimbursement at monthly intervals, actually reimbursed plaintiff weekly, concurrently with the release of plaintiff's checks, so that plaintiff did not draw on its own money. Plaintiff was thereby able to operate with a total of $40,000 in working capital at the Army plants.

Plaintiff's capital needs were limited to the mentioned working capital and the approximately $822,000 cost of corporate overhead not reimbursed as a cost. Only a fraction of this latter sum was ever tied up for long, because the fixed fees which defrayed the overhead and provided profits were paid promptly. Capital needs for operation of the four plants were negligible.

The system of cost-reimbursement was so prompt, and the payment of fixed fees so frequent, that plaintiff was not required to use substantial amounts of its own funds for extended periods of time, and may not expect favorable consideration under this factor. Such ratios as turn-over of capital, net worth to sales and rate of return on capital employer are irrelevant.

a. *Capitalization of know-how.* Plaintiff urges that its "know-how" be treated as an asset and the substantial value thereof be added to the capital devoted to the business.

Plaintiff relies on *North Am. Aviation, Inc. v. Renegotiation Bd., supra*, 39 T.C. at 228–29, and *Boeing Co. v. Renegotiation Bd., supra*, 37 T.C. at 635–36. *See also Offner Products Corp. v. Renegotiation Bd.*, 50 T.C. 856, 863 (1968); *X-Ray, Inc. v. Renegotiation Bd.*, 28 P–H Tax Ct. Mem. 459, 465, 7 CCF ¶71, 117 (1959). In the cited cases the contractor had contributed relatively small amounts of capital which by the use of know-how and expertise were made unusually productive. The Tax Court accordingly recognized know-how as a capital asset, as a means of calculating proper compensation or allowable profits. A. E. Burns, *The Tax Court and Profit Renegotiation*, 13 J.Law & Economics, 307, 316 *et seq.* (1970).

In the instant case, however, plaintiff contributed no capital to the enterprise, and, moreover, all the know-how in question was obtained at the cost of the Government. In all the years in which the plaintiff operated these plants, the Government bore the cost of the development of the recruitment and training skills, the innovations and improvements—the accumulation of all the experience which was the source of the know-how and expertise now said to be a capital asset of the plaintiff, to be added to its capital contributed. On such facts it is inappropriate to capitalize "know-how." The products of "public capital" should not be converted to "private capital." Here it is appropriate to give the words "net worth" and "private capital," in the statute and in the regulations, their normal meaning of the kind of net worth and capital found in balance sheets, consisting of money and assets of the owners actually invested in the business for productive use. Sec. 103(e)(2), note 1, *supra*; Regulations,

§ 1460.11. The skill of plaintiff's personnel and the other facets of plaintiff's know-how will get the recognition they richly deserve under the factors of "efficiency" and "contribution to the defense effort." To treat them in addition as capital would double their weight.

Finally, there is no basis in the record on which a capitalization of "know-how" could be based. In at least one case, the Tax Court found itself unable to value the know-how of a company for lack of relevant data in a record before it. *LTV Aerospace Corp. v. Renegotiation Bd.*, 51 T.C. 369, 405–06 (1968). The record in this case is equally barren of data on which the plaintiff's substantial know-how could be capitalized.

b. Plaintiff claims that it was exposed to several risks of losses which required that it maintain a substantial part of its surplus of over $5 million as a reserve, and thus that it actually devoted large parts of its capital to the needs of its business. None of these arguments has merit.

The financial risk from possible loss of the very substantial values in Government-furnished property entrusted to plaintiff was negligible. No appreciable losses on this account, nonreimbursed, were shown to have been suffered. Plaintiff was by contract indemnified for any such loss, excepting only losses caused by misconduct of top management.

There was no financial risk from the possibility that reimbursement might be made by the Army at less frequent intervals than weekly, thereby requiring that plaintiff maintain large amounts of working capital at the plants. The Army recognized that plaintiff must be compensated for the use of any additional capital, and were a different schedule of reimbursement to be adopted, it would be accompanied by such additional compensation as would defray the cost of the additional capital. Indeed, this is what occurred, in 1972.

Another risk contended for is based on the hazardous nature of the business— the risk of explosion of the large quantities of high explosives which are extensively handled. While the risk is presumably minimized by plaintiff's high degree of expertise and the safety programs it puts into effect, the personnel at work in the plants is nevertheless subject to an irreducible risk. But the financial risk is the Government's.

The Army by contract explicitly assumed the financial consequences of explosion. The AEC by contract undertook to bear the nuclear risk, up to $500 million in the United States and up to $100 million outside the United States. While the AEC was reluctant in 1967, to explore the possibility of insurance for the nonnuclear risk of explosion, it undertook to cover all "just and reasonable costs." Plaintiff was therefore reasonably justified in relying on Government responsibility for the costs of any explosion. Plaintiff has not borne any but inconsequential costs from explosions since it first began operation of these plants in 1958.

A last risk said to require maintenance of reserves was the risk of termination for the convenience of the Government, upon which plaintiff might need its capital to re-enter other business. This is neither a true risk nor among the risks to be considered under the statutory factors. Termination for the Government's convenience, in a cost-plus ammunition plant where orders are placed for lots of ammunition as needed, is not very different from termination by full performance. When ammunition is no longer needed, orders will cease to be placed. In any event, plaintiff was free to use its capital and surplus to enter any business it desired or to return to its former business, which it abandoned because of diminishing profit possibilities.

c. The regulations provide that where the capital employed is the Government's, the contractor's contribution becomes "one of management only." Regulations, § 1460.11(b).[15] The principle

---

**15.** The regulation provides (Regulations, § 1460.11(b)):

"(3) Capital employed is the total of net worth, debt, and any assets furnished by the

embodied in the foregoing regulation was approved in *Boeing Co. v. Renegotiation Bd., supra,* where a great preponderance of Boeing's facilities and production equipment were Government-furnished. The court held that "petitioner's profits cannot be viewed in the same light as those of a manufacturer which in performing a Government contract furnishes all or a major proportion of the manufacturing facilities used." Boeing's "function," the court held, "was * * * to some extent that of a manager and not a manufacturer." 37 T.C. at 644.

In a second case dealing with a similar situation, the Tax Court said that "a contractor which uses its own assets is entitled to an element of return equivalent to the rental value of the assets, a contractor using the assets of others is not." Also, that a contractor who relies heavily on Government-owned property "is primarily a manager," and "is not entitled to as large an absolute amount of profit as a contractor using its own property." *LTV Aerospace Corp. v. Renegotiation Bd., supra,* 51 T.C. at 405.

 The view of plaintiff's services as that of a manager or operator need not preclude a fair profit, which will make full compensation for all the services performed, whether described as plant management, maintenance or operation, mobilization of the Government's resources, recruitment and training, or even the manufacture of ammunition. This plaintiff is not, of course, a mere plant manager, who even if he managed four plants might be entitled only to the equivalent of a generous salary and fringe benefits. The proper wages of

the management provided by plaintiff must include the compensation due an entrepreneur, but not the capital supplier.[16] Plaintiff is an entrepreneur who provided the total services of operations of four plants, including bringing two of them up to full production and such development, innovation and maintenance work as was required. The services were a productive mobilization and use of exceedingly large assets and plaintiff is entitled to compensation with a view to the amount of assets mobilized and made productive, regardless of their source, if not to a return on capital supplied by others. *LTV Aerospace Corp. v. Renegotiation Bd., supra,* 51 T.C. at 405. It should, however, be understood that the production or manufacture involved is not of the ordinary kind, performed by an entrepreneur, who having furnished his own capital and borne his own costs, and sold the product, is entitled to all the elements of the profit due the capital supplier—rental or return for the use of the capital, compensation for the risk of loss and even sums needed for new economic growth.

In a word, plaintiff cannot expect a return on capital it has not employed or contributed. The level of its compensation cannot be judged by those standards which automatically come to mind for enterprises which supply their own capital needs.

## VIII

### Reasonableness of Costs and Profits

The distinction made earlier (see p. 17) between costs borne by the Government, on the one hand, and plaintiff's home

---

Government or customers not contained in the contractor's records. The source of capital will be established in order that a determination may be made of the extent to which capital employed in renegotiable business came from public sources or from customers, or was furnished by the contractor.

"(4) The relationship of profit realized on renegotiable business to the capital and net worth employed in renegotiable business will be used as one of the considerations in the final determination of what constitutes excessive profits. A contractor who is not depend-

ent upon Government or customer financing of any type is entitled to more favorable consideration than a contractor who is largely dependent upon these sources of capital. *When a large part of the capital employed is supplied by the Government or by customers, the contractor's contribution tends to become one of management only and the profit will be considered accordingly."* [Emphasis added.]

16. B. S. Kierstead, *Profit,* in 12 International Encyclopedia of Social Sciences 547, 548 (1968).

office overhead costs for which plaintiff was not reimbursed, on the other, bears repeating here. The reduction in costs borne by the Government, as a result of plaintiff's efficiency, is taken into account under the statutory factor of "efficiency." In now evaluating the reasonableness of costs and profits, we are concerned with plaintiff's own nonreimbursed costs, *i. e.*, home office overhead.

Section 103(e)(1) of the statute directs that in determining excessive profits, if any, there is to be considered the "[r]easonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products." The regulations, § 1460.10(b)(1), state that "[c]omparisons will be made with the contractor's own costs and profits in previous years and with current costs and profits of other contractors, if such information is available."

The record contains evidence permitting both comparisons set out in the regulation. We first consider plaintiff's 1967 costs and profits with relation to its costs and profits in previous normal or peacetime years. Subsequently, we will compare plaintiff's costs and profits in 1967 with those of other GOCO contractors in that year.

From 1962 through 1965 plaintiff's gross income from sales was stable at a level of about $40 million. The actual figures are as follows:

| | |
|---|---|
| 1962 | $41,282,276.45 |
| 1963 | 39,445,883.91 |
| 1964 | 40,748,260.31 |
| 1965 | 39,503,465.09 |

All but a small percentage of that income was derived from sales in the four GOCO plants operated by plaintiff.[17] We know that in 1965 the Iowa ammunition plant was operating at a relatively low production level, with seven of the maximum 11 production lines in use.[18] The Cornhusker plant was not engaged in production at all, with plaintiff's only fee a small one for maintenance of the plant in the "mothballed" state. Plaintiff was, of course, receiving fees for its management of the AEC plants in 1965.

When American participation in the war in Vietnam intensified, beginning in late 1965, the need for ammunition increased correspondingly, and production at the two Army plants operated by plaintiff increased sharply. Cornhusker was activated, and production at both plants steadily enlarged. The labor force was doubled in each of the years 1966 and 1967, to the point where in 1967 Cornhusker was operating at full capacity, and Iowa was, during most of 1967, producing at "a very high level," with 10 of 11 production lines operating, most of them on a two- or three-shift basis.

The increase in production was directly mirrored in the rise in plaintiff's sales (receipts), which consist of its reimbursable costs plus fixed fees per unit.[19] The rise in receipts, and in addition the rise in profits, and profits expressed as a percentage of receipts, are depicted in the following table:

| | Receipts | Profits | Ratio |
|---|---|---|---|
| 1965 | $39,041,000 | $647,000 | 1.66 |
| 1966 | 62,774,000 | 1,122,000 | 1.79 |
| 1967 | 112,931,000 | 2,681,000 | 2.37 |

On the basis of the above statistics, therefore, the year 1965 may be viewed as an historical base year of normal or

---

17. The record shows that since 1958 plaintiff has been engaged almost entirely in the management of the four plants. ·The record also shows that in 1965, $39,041,000 of the $39,-503,465.09 was renegotiable receipts.

18. The record does not show whether there was more than one shift per day.

19. The rise in fees and profits which is the subject of this section was limited to the Army plants. The fixed fee for managing the two AEC plants was the same in 1967 as in 1966. It is held on the record to have been reasona-ble—neither too high nor too low. The Government's contention of excessiveness by reason of profits under the Army contracts above does no violence to the provision of the Act for appraisal of profits of a contractor on an overall, fiscal year basis. 50 U.S.C. App. § 1215(a) (1970). Cost-plus contracts such as these Army contracts have very great potential for excessive profits. The regulations provide for their special scrutiny. Regulations, § 1460.2(b); *see Pressed Steel Car Co. v. War Contracts Price Adjustment Bd.*, 20 P–H Tax Ct. Mem. 312, 5 CCF ¶ 61,149 (1951).

peacetime earnings. We reject plaintiff's arguments that there is no "normal" year in plaintiff's business because of the "cyclical" nature of the industry. If by "cyclical" plaintiff refers to the fact that volume of production rises sharply in wartime, then this is a fact which is shared by most companies which enter into renegotiable contracts, and was a fundamental reason for enactment of the Renegotiation Act. Plaintiff originally entered into the GOCO business because competition in other areas was so severe. It could not have expected that in the majority of years of operations the United States would be involved in a war requiring maximum production and affording opportunity for increased profit levels. It could not have reasonably expected during the period 1962–65 that a war was approaching which would result in much higher profit levels. We have no reason to believe that plaintiff viewed its profit in the year 1965 to be unreasonably low.

Nor were plaintiff's operations in 1967 fundamentally different from those in 1965. Operation of the AEC plants continued throughout. Plaintiff produced ammunition for the Army in 1965 just as it did in 1967, though the normal or peacetime level of production required the use of only one plant at a relatively low level of production, rather than two plants producing near capacity.

Finally, we note that whatever expectations or hopes plaintiff might legitimately have for increased profits in wartime are not ignored in the renegotiation process. For example, plaintiff's increased profits and profit margin in 1966, resulting from increase in volume due to war, were not found to be excessive by the Renegotiation Board.

Having established the year 1965 as a representative base year of normal production and earnings for plaintiff, we are able to draw some conclusions about the reasonableness of plaintiff's profits in 1967.

As volume increased sharply in 1966 and 1967, total fixed fees mounted correspondingly. The amount of the fee per unit of ammunition by and large remained the same, though greatly increased quantities were produced. Orders were placed to the limit of capacity of GOCO plants to fill, without competition either as to estimates of costs or fixed fees, and substantially without negotiation as to fees.

Fresh discussions or negotiations as to the amount of a fixed fee per unit took place about once a month, and were limited to fees for experimental, new, or pilot lots or items in which a technological development had brought about a drastic reduction in estimated costs. Once a fee for a unit of ammunition was established, it would remain the same in all repeat orders. For instance, the fee paid per unit, at the Iowa plant, for 175-mm. projectiles remained at $0.27 per unit from 1966 to 1970,[20] though costs went up and down, and though fees had been fixed on the basis of a shorter war and shorter production runs than eventuated. Hundreds of repeat orders were placed, and fees were agreed to, cursorily, on the telephone. Moreover, the same fixed fee was with rare exceptions paid to all the contractors who produced an item.

No consideration was given to reduction in the fixed fees for quantity. Indeed, one of the reasons for the fixed-fee-per-unit system was that it would obviate the need for negotiations over

| 20. Period | Quantity | Unit Cost | Fixed Fee | Percentage of Fee to Unit Cost | |
|---|---|---|---|---|---|
| | | | | In Evidence | (Correct) |
| 1966 ................ | 505,000 | $8.338 | $0.27 | 3.35 | (3.24) |
| 1967 ................ | 111,000 | 7.724 | 0.27 | 3.62 | (3.50) |
| 1968 ................ | 485,000 | 6.904 | 0.27 | 4.07 | (3.91) |
| 1969 ................ | 833,000 | 5.683 | 0.27 | 4.99 | (4.75) |
| 1970 ................ | 173,000 | 7.694 | 0.27 | 3.64 | (3.51) |

fees on repeat orders. The paramount objective was production, not economy or limitation on profits, and the procurement authorities wished to avoid the delay caused by protracted negotiations over fees. The APSA reports on the two Army plants put it simply: "There have been no significant refunds or price reductions."

The increase in production made no financial demands on plaintiff. The necessary increases in costs of training, recruitment, materials, equipment and facilities were all paid for by the Government. Free of the need to provide capital to finance the increased capacity and production, plaintiff was able to spread its nonreimbursable overhead costs—largely the relatively stable cost of corporate headquarters—over the greatly expanded number of units produced. The nonreimbursable cost of overhead rose by only $67,000 in 1967 over 1966, from $755,000 to $822,000, though receipts rose from $62.7 to $113 million. Profits in 1967 were 314 percent higher than in 1965 while receipts rose only 189 percent during that 2-year period. By comparison to 1966, profits in 1967 were 139 percent higher while total receipts went up a much lower 80 percent. Plaintiff's margin of profit rose from 1.66 in 1965 to 1.79 in 1966 and 2.37 in 1967.

■■■ This combination of increased volume due to war demand, decreased competition, and rising profits and profit rates resulting from the spreading of overhead over more units of production, has traditionally signaled the existence of excessive profits. It is a cardinal principle of statutory renegotiation that where expanded war production decreases unit costs and increases the contractor's profits "without exceptional effort

and without corresponding increases in costs, * * * the Government should normally get the principal benefit in more favorable prices, or in renegotiation." Regulations, § 1460.10(b)(3). The principle first appeared in administrative statements issued in 1942 and 1943 under the first renegotiation laws, and was approved by the Supreme Court in *Lichter v. United States, supra.*

The first of these directives stated that in considering what is "a reasonable war-time margin of profit," consideration should be given to various factors, among them "the volume of sales, the allowable percentage being reduced on a graduated scale as the volume increases." [21]

The second directive emphasized the special applicability of the principle where capital and plant come from the Government: [22]

1. *General principles followed in determining excessive profits.*—In considering whether costs or profits on war contracts are excessive, the price adjustment boards are guided by the following broad principles:

\* \* \* \* \* \*

(d) That as volume increases the margin of profits should decrease. This is particularly true in those cases where the amount of business done is abnormally large in relation to the amount of the contractor's own capital and company-owned plant, and where such production is made possible only by capital and plant furnished by the Government.

A leader in the development and administration of statutory renegotiation, Mr. Laird Bell, chairman of the Navy Department Price Adjustment Board

**21.** *Principles, Policy and Procedure To Be Followed in Renegotiation,* War Dept. Price Adjustment Board, August 10, 1942, reprinted in *Hearings Before the Subcomm. of the Senate Comm. on Finance on Sec. 403 of Pub.L. No. 528,* 77th Cong., 2d Sess. (Sept. 29 and 30, 1942), *supra,* note 3, at 39.

**22.** *Joint Statement by the War, Navy and Treasury Departments and the Maritime Com-*

*mission—Purposes, Principles, Policies and Interpretations Under Sec. 403 of the Sixth Supp. National Defense Appropriation Act of 1942, as Amended by Sec. 801 of the Revenue Act of 1942 (Public 753, 77th Cong.), Oct. 21, 1942,* March 31, 1943, reprinted in *2 Hearings Before the House Comm. on Naval Affairs on H.R.Res. 30,* 78th Cong., 1st Sess. (1943), *supra,* note 3, at 1028.

and vice chairman of the War Contracts Price Adjustment Board, stated, in 1944, that where no capital is required to finance an expanded wartime production which creates sharply increased profits, the contractor is "properly rewarded" with "a very modest increase over the * * * profit of the [prior] year. In short, his profit ratio should decrease in some more or less definite relationship to the increased volume." [23]

The same views were expressed under the Renegotiation Act of 1951 by Mr. John T. Koehler, the Chairman of the Renegotiation Board during the first 3 years after its creation under the 1951 Act, in an address to the American Management Association in 1952. He expressed the view that the benefits of decreased costs from expanded wartime production are so much the Government's that the contractor should get a lower profit per unit of expanded wartime production than on prewar, peacetime production. See J. T. Koehler, *An Imaginary Renegotiation Case—How Statutory Factors Are Applied*, speech delivered to the American Management Association, 1952, reprinted in *The Renegotiation Guide* 59, 60 (1957).

By these statements of the principle, taken in isolation from the other statutory factors, plaintiff should be allowed profits on increased quantities at a rate *less* than its 1965 rate, not more.[24] As plaintiff rightly urges, the principle cannot be applied rigidly, for if it were, a GOCO contractor would have no incentive to lower the Government's costs. It is, however, an important principle to be applied in conjunction with the other relevant criteria.

The second comparison required by the regulation to be made, where feasible, is the contractor's costs and profits in the year in question vis-á-vis those of other contractors. A GAO report to the Congress, entitled "Defense Industry Profit Study" (1971), shows that profit as a percent of sales for Department of Defense GOCO contractors in 1967 averaged 3.1 percent. A second study, released by the Department of Defense, shows that in 1967 the average profits of Department of Defense GOCO ammunition plants, as a percentage of costs, was 3.1 percent; of 34 contracts included in the study, the profit ranged from a high of 6.7 percent to a low of 1.7 percent.

The 3.1 percent average in the above studies is a *pre*-renegotiation figure. Thus the average itself has not been examined for excessiveness, and we should exercise care in comparing plaintiff's profits with an average profit which may itself be excessive. For instance, we know that another GOCO contractor which operated a large ammunition plant for the Army in 1967 received a pre-renegotiation profit amounting to 3.1 percent of sales. The Renegotiation Board, however, determined that those profits in excess of 2.7 percent of sales were excessive and reduced the contractor's profit margin accordingly. The fact that the 3.1 percent average is thus inflated does not, however, destroy the usefulness of the comparison altogether. Industry averages will seldom be entirely satisfactory for purposes of comparison, and we should not expect otherwise. We think it may fairly be inferred that the industry average, after reduction for excessiveness, would have been in the range of 2.5 to 3.0 percent of sales, and in any case higher than plaintiff's 2.37 percent profit margin. .

■ It is true, as defendant stresses, that the average is made up of plants of various sizes and that individual profit margins, prior to renegotiation, ranged from 6.7 percent to 1.7 percent. Further

**23.** L. Bell, *Major Factors in Determining Excessive Profits*, Transcript, Univ. of Chicago Conference on War Contracts, Renegotiation and Termination, April 10–12, 1944, reprinted in *Coordinators' War Contracts Guide* 13 (1944).

**24.** Had plaintiff's rate of profit for 1967 been *equal* to the rate, 1.66 percent, of 1965, plaintiff's 1967 profits would have been $1,875,000 or $806,000 less than plaintiff actually received. Rigid application of the principle would thus result in reduction of plaintiff's profits by more than $806,000.

information, if available, pertaining to the costs, profits, efficiency, etc., of the individual contractors which comprise the average might have presented a clearer picture of plaintiff's relative standing. Plaintiff, however, did not possess, and was unable reasonably to obtain, such information. By placing into the record the industry averages which were available, plaintiff has met its burden of going forward. *Lykes Bros. S. S. Co. v. United States, supra,* 459 F.2d at 1401, 198 Ct.Cl. at 326–27. Usefulness of the average as a guidepost is not diminished by the obvious fact that diverse contractors make up the average.

In sum, the two comparisons required by the regulation for determining reasonableness of costs and profits lead to widely divergent conclusions. On the one hand, comparing plaintiff's 1967 profits with normal or peacetime earnings, it appears that plaintiff's profits were excessive to a very great extent, that plaintiff's profit margin should be reduced from 2.37 percent to less than 1.66 percent. The comparison with other GOCO contractors, on the other hand, suggests that plaintiff's margin of profit is not excessive in any degree.

There is one additional *datum* in the record bearing on the reasonableness of plaintiff's costs and profits in 1967. An expert witness—an economist—testified for defendant that plaintiff's profits were excessive to the extent of $551,000. This figure reflects the expert's view that the percentage rise in profits from 1966 to 1967 should not have exceeded the percentage rise in sales for those years. The expert's failure to justify in detail the method he chose for calculat-

ing excessive profits lessens to some degree the weight we might otherwise give to his testimony. We nevertheless accept it as one element in defendant's meeting of its burden of proof of excessiveness.

## IX

### The Public Interest and Fair Dealing

Section 103(e)(6) (note 1, *supra*) provides for consideration of such "other factors the consideration of which the public interest and fair and equitable dealing may require." [25]

The renegotiation process requires that a balance be struck between the public's interest in prices for war materiel at fair and uninflated prices and the contractor's right to fair and equitable treatment. On the one hand the profit allowed must not be so high as to condone profiteering, nor yet so low as to deter the production of war materiel efficiently and in volume, indispensable for success in defense or war.[26] These propositions are implicit in the execution of the next and last step in the process of redetermination of the excessiveness of plaintiff's profits.

## X

### Conclusion

The final step is, of course, the determination of the amount of plaintiff's excessive profits in 1967, in light of all the statutory factors discussed above. We must first dispose, though, of one final argument by plaintiff. Plaintiff argues that it should not be subject to renegotiation at all, that the facts of this case do not fit those for which renegotiation was

---

**25.** The statute contemplates that such factors would be adopted by the Board and published in the regulations. That the Board has not adopted any such additional factors (Regulations, § 1460.15) is not a bar to consideration by the court on a redetermination of excessive profits under sec. 108 of the Act. 50 U.S.C. App. § 1218 (1970).

**26.** Regulations, § 1460.10(b)(3); *Report of the Special Senate (Truman) Committee Investi-*

*gating the War Effort,* S.Rep. 10, Part 5, 78th Cong., 1st Sess. 1–3 (1943), quoted in *Lichter v. United States, supra,* 334 U.S. at 760, 68 S.Ct. 1294, n. 6; *Efficiency and Effectiveness of Renegotiation Board Operations,* Report of the House Committee on Government Operations, H.R.Rep. 92–758, 92d Cong., 1st Sess. 14 (1971); H. S. Hensel & R. G. McClung, *Profit Limitation Controls Prior to the Present War, supra,* n. 7, at 216.

intended. In so arguing, plaintiff relies on testimony by the contracting officer to the effect that he intended plaintiff's fees to be approximately 3 percent, as they were, and that he considered that level of fees to be reasonable.

■ The contracting officer's view of what was reasonable is not controlling on the court although certainly it is one element to be evaluated. The record shows that when war demand resulted in sharply increased quantities of production, no thought was given to decreasing unit fees. While, as the contracting officer testified, unit *fees* were maintained in 1966 and 1967 at approximately the same 3-percent level as in the prior peacetime years, the level of *profit* rose from 1.66 percent in 1965 to 2.37 percent of sales in 1967. We believe that, to the extent that plaintiff's profits are determined herein to be excessive, the contracting officer's opinion of reasonableness is simply incorrect if it stands alone.

■ We believe defendant has met its burden of proof to show excessiveness. It has done so by demonstrating that plaintiff's risks were virtually nonexistent, that plaintiff invested little capital, and that its rise in profits was due to increased wartime volume, without competition and with no downward adjustment in fees for increased quantity. It has buttressed its evidence with expert testimony. Defendant has persuaded us, on the record, that plaintiff's 1967 renegotiable profits were unreasonably high. Our examination of all relevant factors, including the contracting officer's views, leads us to the conclusion that plaintiff's renegotiable profits in 1967 were excessive in the amount of $423,000. As a percentage of sales, plaintiff's profits are thus found to be nonexcessive to the extent of about 2 percent. This figure lies between the disparate results suggested by the comparisons to normal earnings on the one hand, and to profits of other similar contractors, on the other. After reduction by $423,000, plaintiff's allowable 1967 profits are $2,258,000, more than twice the profits of 1966 although volume did not double from 1966 to 1967, and far more than the "very modest increase over the * * * profit of the [prior] year," suggested by Mr. Laird Bell. At the same time, of course, reduction of plaintiff's profit margin to 2 percent of sales results in plaintiff's earning a margin of profit less than the Department of Defense GOCO industry 3.1-percent average for that year. A 2-percent return takes into account, favorably, plaintiff's efficiency, character of business, and significant contribution to the defense effort. At the same time it recognizes that plaintiff incurred virtually no risk and invested little capital of its own. This result, predicated on all the statutory factors and the industry experience, is in the public interest but at the same time deals fairly with plaintiff which deserves to be compensated equitably for work well done in increased volume for the war effort.

Judgment for the United States in the amount of $423,000, less appropriate tax credits, must be entered on defendant's counterclaim, with interest as provided by law.

NICHOLS, Judge, with whom KASHIWA, Judge, joins, dissenting:

I am grateful for the court's candid admission that the plaintiff made a *prima facie* case. This means that our holding in Lykes Bros. S. S. Co. v. United States, 459 F.2d 1393, 198 Ct.Cl. 312 (1972) comes into play. The Government bears the burden of proof. It "shifts to the Government to prove that the plaintiff's profits were excessive and the extent thereof. This encompasses not only the burden of going forward with evidence after plaintiff's case in chief is closed, but also the burden of persuasion." [Fn. omitted] 459 F.2d at 1402, 198 Ct.Cl. at 327.

We thus intended to effect a sweeping change in the previous Tax Court procedure in redetermining excessive profits under the Renegotiation Act of 1951, 50 U.S.C.App., §§ 1211–1224. That tribunal started with a presumption the Board was correct. The contractor had to show

wherein it was wrong and all the Government had to do was to bolster the determination up when it appeared to be crumbling under the attack. Despite the *de novo* nature of the proceeding which the Congress had attempted to enact, the structure of fact and reason that emerged after trial was mostly the Board's. Much, other than evidence, came into the Board determination by perfectly legitimate routes, for an open, adversary, due process proceeding was not required there. It stayed with the Tax Court determination, and the result depended for its foundation in part on the knowledge and experience of Board members, and on what they learned apart from any due process record. We were going to change all that. If the Government wanted us to uphold the Board it must prove to us the Board was right with no help from any presumption.

To the extent the Government does not supply reasons and techniques, it calls on us to fabricate our own. Yet, in *Bethlehem Steel Corp. v. United States*, 511 F.2d 529, 532, 206 Ct.Cl. —— (1975), we pointed out in a different but related context, that persons " 'learned in the law' can hardly be also expected to be so expert as not to need guidance as to the techniques of reasonable profit determination." We there decried "do it yourself guidelines" and "seat of the pants navigation."

It would seem to follow that in the absence of a satisfactory structure of facts and reasons, erected on the record in accordance with the factors prescribed in the statute, 50 U.S.C. § 1213(e), that supports a refund determination, it is our duty to issue the contractor a clearance, or no excessive profits determination, and this even though we may find the task distasteful because we personally feel the contractor made too much money. This is the transformation we have effected. It is our duty to swallow the medicine we ourselves brewed in the *Lykes* case like little men, whether we relish it or not.

I find it impossible to conceive how any tribunal, composed as this court is, can determine excessive profits in a case such as we have made these cases to be, without the help of expert testimony. The following colloquy at the oral argument is, I think, revealing:

Judge Nichols: "How can we get along without them [experts] here?"

Mr. Ranney: "Well, your Honor, this was one of the early cases tried. We did have one expert in the conference. I do feel that the records that will be coming forth in the other cases—with the one case that is cited—in all cases there were experts on both sides—I know in that case particularly on the Government side. There were other cases in the process of being tried at this time—are going to ———."

Judge Nichols: "The best expert is * * * (inaudible)"

Mr. Ranney: "We are in the same boat as the court. When the law was changed in 1970 and the cases initially assigned to the Court of Claims section of the Civil Division, we hadn't ever tried one of these before. In the Tax Court they were handled by a separate group. As a result, we had to learn how to walk before we could run. So we were sort of feeling our way along on these earlier cases."

Judge Kunzig: "[Is this a] creeping or running or walking case?"

(Laughter.)

No one would suggest that the members of this court appraise a tract of land by just looking at it. Somehow, a renegotiation is different.

It seems apparent to me that the Government could qualify as experts many of those who participated in making the Board decision, either in a member or staff capacity. To do this would in no way compromise the *de novo* character of the trial in this court. As for the contractor, its own officers could give competent testimony, or others could be retained. If we receive some self-serving testimony, we should know

how to discount that feature of it. There are many persons formerly engaged in renegotiation on the Government side, now resigned or retired, who no doubt could give informed and knowledgeable testimony on behalf of a contractor who retained them. There are related occupations such as securities analysis. In fact, the ablest renegotiator I ever knew, Chairman Ed. Barker, Navy Price Adjustment (Renegotiation) Board, *circa* 1946–48, came into renegotiation direct from the securities business. By ablest, I mean the best able to articulate an analysis of the reasonableness or excessiveness of a contractor's profit in light of direct application of the factors, one by one.

This case is an example of the lawyer's delusion that we can do everything without appropriate help. We tend to under value the other word-smithing and idea-mongoring disciplines, such as economist, or accountant, and to assume that whatever they can do we can do better. However, I do not rate economists high among the disciplines that can be most helpful in renegotiation. We had a well-qualified economist on the Renegotiation Board staff in 1951–54, but he was, rightly I think, never asked to recommend an individual excessive profits determination. He advised us on profits, costs and trends in whole industries. I valued his services much more than the Board did.

The court says it had expert testimony here. This consisted, on the Government side of one economist. The court's endorsement of him in the opinion is lukewarm indeed. The value assigned his testimony by the Government is shown by the above-quoted colloquy at oral argument. The value as assigned by our trier of fact is shown by his findings which, before amendment by the court, nowhere mentioned this testimony. The court added findings 47(a) and (b). The trial judge allowed to plaintiff less as a reasonable profit than this Government witness would have allowed.

The contracting officer testified and might be considered a kind of expert, though his operating capacity in the case would conflict with the status of a true expert. He thought reasonable the 3% profit on receipts he expected and intended all GOCO contractors to make.

The seat-of-the-pants character of the decision now proposed is best illustrated by the fact that both the trial judge and the court regard "normal earnings", *i. e.*, earnings in a normal year, as the best yardstick to justify a refund determination. However, they differ as to what "normal" year to use. The trial judge picked 1966 and the court 1965. Yet the lower "normal" profits in 1965 are referred to by the court to justify a relatively higher retained profit for 1967, the year under review, and the higher "normal" profits of 1966 were invoked by the trial judge to support his recommended lower retained profit for 1967. If the trial judge and the court really *used* these so-called "normal" figures, the court should have come up with a bigger refund than the trial judge did.

Obviously, 1966 was not a normal year, with respect to the Army business where the alleged excessive profits were. The contractor was moving out of standby status, activating one entire dormant plant and new lines in another, and in so doing incurred costs that had not been incurred *before* and would not be incurred in full production, "starting up" and "learning curve" costs, and what the Board called "support activities". As the fee per unit of production was fixed, while the cost per unit was high, the profit stated as a percentage of cost was low. As to 1965, that was the final year of little or no consumption of the product, virtually a stand-by year. In a type of business where full production is attained only in time of emergency, is a stand-by year to be deemed a normal year? Maybe so, but before accepting the notion, I would like to see some informed and reasoned support for it. In face of both opinions, I would hold that for a contract manager of GOCO ammunition plants, the statutory factor of "normal earnings" is wholly unhelpful and should be discarded as a measure to

determine the reasonableness of profit earned. The "normal earnings" factor is of value in dealing with companies that convert to defense production, as the auto companies did in World War II, or with companies producing articles, such as trucks, having both war and peacetime uses. The effect of its use here is simply to penalize a company that stayed in existence through lean years in standby as against a hypothetical one that might have been newly formed to manage GOCO plants.

As the contractor reached full production at the start of 1967 its efficiency improved and as a result the unit costs declined. The Government got benefit from this efficiency in having to reimburse only for lower unit costs. The court thinks that lower unit fees should also have been negotiated. The statute says that favorable recognition *must* be given for efficiency. The court is changing the trial judge's proposed opinion by underlining the word "must" as quoted by him. I would like to see a demonstration, then, that the court is not penalizing efficiency instead of rewarding it. Should the cut in production cost be large enough, it might be arguable the unit fee should be increased, not decreased. This is the essence of the familiar "incentive" contracting, which is not in contention here, of course. The proper concept still is that the Government and the contractor should share the benefits from increased volume and efficiency. The court here fails to demonstrate that if the contractor had remained inefficient, *i. e.*, had failed to reduce the 1966 unit costs, the court would not have allowed a larger profit simply because, stated as a percentage of cost it looked smaller. The court has also failed to demonstrate that the share each side enjoyed in the benefits from volume and efficiency was not a fair share before renegotiation.

To take the 177 mm. projectile produced at the Cornhusker plant as typical, the figures in the court's fn. 20 show a unit cost reduction of $.61.4 (61.4 cents) from 1966 to 1967. In this instance, there was a reduction, not an increase, in volume, so the saving must be due wholly to efficiency. The fixed unit fee was $.27 (27 cents) both years. I take it, applying the proposed refund proportionately to this unit fee, the court is reducing it to about $.22 (22 cents). Thus the saving to the Government is increased from $.61.4 (61.4 cents) to $.66.4 (66.4 cents) and the reward to the contractor is cut by five cents. If the court is doing anything but penalizing the contractor for its efficiency, I would like to have its explanation how. If there is any sharing of the reward for efficiency between Government and contractor, how and where? There were further savings per unit of $.82.0 (82 cents) in 1968 and $1.22 (one dollar and twenty-two cents) in 1969, by the end of which year, extrapolating the court's decision according to logic, it would seem the fee should be eliminated entirely.

The quotes the court uses from Laird Bell and John T. Koehler, are misleading in that both were speaking about fixed price sales, where the contractor would monopolize all the cost savings due to increased volume unless the price were reduced by negotiation or renegotiation. Here, with fixed unit fees plus cost reimbursement, the Government automatically gets a large benefit from efficiency and volume saving, and the sole question is, how much more would be fair to exact.

The court makes a to-do about the absence of risk and low commitment of contractor capital. Yet it surely knows that contractors who incur risks and use their own capital are not obtainable at under 3%. Here the unit fees are, virtually, commissions.

I am not disputing that possibly some fee reduction should have been made. Or possibly not. My complaint is that in our very first renegotiation case to come to us on the merits, we are not adhering to the standards we set for ourselves in the *Lykes* case. We are not requiring the Government to prove its case. As I see it, we are not even analyzing the issues to the point where we can tell for

sure whether we are rewarding or penalizing efficiency. Insistence on standards of proof would benefit the public more than the small amount—as such cases go—to be recovered here as a refund. I would issue a judgment clearing the contractor of liability for excessive profits for its fiscal year 1967.